UNITED STATES of America

v.

John W. JENRETTE, Appellant.

No. 83–2281.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 23, 1984.

Decided Sept. 18, 1984.

Kenneth M. Robinson and W. Gary Kohlman, Washington, D.C., with whom Dennis M. Hart and Stanley Brand, Washington, D.C., were on the brief, for appellant.

Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Reid H. Weingarten, Atty., U.S. Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before WRIGHT, TAMM and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Former Congressman John Jenrette appeals his conviction on bribery charges stemming from the undercover operation by the Federal Bureau of Investigation (FBI) known as "Abscam." Jenrette contends that 1) the trial court erred in declining to instruct the jury on the defense of duress; 2) the evidence adduced at trial established entrapment as a matter of law; 3) the FBI's conduct during the investigation violated principles of due process; and 4) the government failed to disclose certain evidence required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For the reasons expressed below, we affirm the conviction.

## I. BACKGROUND

This court is by now quite familiar with the FBI's undercover operation known as Abscam. *See United States v. Weisz,* 718 F.2d 413, 416–17 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, ——, 104 S.Ct. 1285, 1305, 79 L.Ed.2d 688, 704 (1984); *United States v. Kelly,* 707 F.2d 1460, 1461–63 (D.C.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983). The Abscam operation involved a fictitious, FBI-created entity, Abdul Enterprises, which was purportedly operated by wealthy Arabs interested in United States investments. During the period relevant to this case, FBI agent Anthony Amoroso assumed the role of president of the organization, and Melvin Weinberg posed as its financial advisor.[1] Through various "middlemen," Weinberg and Amoroso offered bribes to members of Congress. In return, the Abscam operatives asked the congressmen to introduce private legislation that would permit their Arab clients to immigrate to the United States.

Jenrette became involved in the Abscam operation through his friend and co-defendant John Stowe.[2] In November 1979, Weinberg told Stowe that his Arab clients were interested in discussing with Jenrette the possibility of a private immigration bill. Weinberg asked Stowe to determine whether Jenrette would introduce such a bill for $100,000. Trial Transcript (Tr.) (Amoroso), Joint Appendix (J.A.) volume II (II) at 227–28. On December 3, 1979, Stowe met with Weinberg and Amoroso to arrange a meeting with Jenrette.[3]

The events that resulted in Jenrette's indictment for bribery began on December 4–6, 1979. On December 4, Jenrette and Stowe met with Weinberg and Amoroso at a townhouse on W Street in Washington, D.C. During the meeting, Amoroso explained that his clients needed help immigrating to the United States. Transcript of Taped Meeting of Dec. 4, 1979. J.A. volume III (III) at 737–43. Jenrette stated that he would introduce or arrange to have

---

1. Weinberg was convicted of fraud in 1977. In return for his agreement to cooperate with the FBI in setting up the Abscam operation, Weinberg received a sentence of three years' probation. The Abscam operation was similar to "sting" operations that Weinberg had run in the past. *United States v. Jenrette,* Cr. No. 80–289, slip op. at 2–3 (D.D.C. July 30, 1983), Joint Appendix (J.A.) volume I (I) at 19, 21–22. *See also United States v. Myers,* 692 F.2d 823, 829 (2d Cir.1982); *United States v. Jannotti,* 673 F.2d 578, 581 n. 2 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

2. The evidence adduced at trial indicates that Stowe had numerous contacts with Weinberg for over a year before Jenrette became involved in the Abscam operation. Stowe was evidently interested in obtaining financing from Weinberg for various business deals. In a conversation with Weinberg in October 1978, Stowe mentioned that he had a friend who was a congressman and stated: "He's a[s] big a crook as I am . . . ." Transcript of Telephone Call on or about 10/17/78, J.A. volume III (III) at 919. Thereafter, hoping to make contact with Jenrette, Weinberg pursued Stowe with promises that his Arab clients might be willing to invest in Stowe's business.

3. At the December 3 meeting, Stowe indicated that Jenrette was ready to handle the immigration problem but that Jenrette did not know the details of the arrangement. Trial Transcript (Tr.) (Amoroso), J.A. volume II (II) at 229. Amoroso told Stowe to explain the arrangement to Jenrette and find out whether Jenrette would agree to meet. *Id.* at 229–30. Stowe indicated that he understood Jenrette was to receive $50,000 up front and $50,000 when the bill was introduced. *Id.* at 230. The following day Stowe called Weinberg to confirm the meeting. Transcript of Telephone Call of Dec. 4, 1979, J.A. III at 710–14.

introduced a private immigration bill. *Id.* at 744. Amoroso then told Jenrette: "We're talking about fifty thousand dollars now and fifty thousand dollars when this thing is introduced." *Id.* at 747. After some discussion about simultaneously introducing a bill in the Senate, Jenrette indicated that he would like to review the immigration laws before accepting the money. *Id.* at 759. Jenrette explained that he didn't want to take the money without "feeling comfortable about being able to do it." *Id.* at 760. Although Amoroso again offered Jenrette the money during the December 4 meeting, Jenrette postponed his response until the following day when he would know whether he could help Amoroso's clients. *Id.* at 766–70. Jenrette then assured Amoroso: "[D]on't get me wrong ... I got larceny in my blood. I'd take it in a ... minute." *Id.* at 772.

Jenrette phoned Amoroso the following day and stated that he would go forward with the transaction but probably could not arrange a meeting that day. Transcript of Telephone Call of Dec. 5, 1979. J.A. III at 788–89. On December 6, Jenrette informed Amoroso by telephone that he wanted Stowe to pick up the money. Jenrette explained that if Stowe received the money, he (Jenrette) would be "a little bit ... away from a section in the code about ... public officials." Transcript of Telephone Call of Dec. 6, 1979, J.A. III at 799. Amoroso agreed to give the money to Stowe. *Id.* at 800. After Stowe picked up the money, Jenrette confirmed with Amoroso receipt of the $50,000. Transcript of Telephone Call of Dec. 6, 1979, J.A. III at 806–07.

On January 7, 1980, Jenrette and Stowe again met with Amoroso and Weinberg. At this meeting, Jenrette brought up the immigration problem and indicated that he might be able to get Senator Strom Thurmond interested in the deal. Transcript of Meeting of Jan. 7, 1980, J.A. III at 852–53. Jenrette and Stowe continued to have contact with the Abscam agents regarding the

proposed bribery of Senator Thurmond until their arrest on February 2, 1980.[4]

On June 13, 1980, Jenrette and Stowe were indicted on one count of conspiracy to commit bribery and two counts of bribery. After a full trial, a jury found Jenrette and Stowe guilty on all counts. Both Stowe and Jenrette filed motions seeking a judgment of acquittal on the ground that the government's investigation was so outrageous as to offend due process, and that the evidence established entrapment as a matter of law. Alternatively, Jenrette and Stowe sought a new trial on the ground that the government failed to comply with the disclosure requirement of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After a lengthy posttrial hearing, United States District Judge John Garrett Penn denied the motions. *United States v. Jenrette*, Cr. No. 80–289 (D.D.C. Aug. 4, 1983), J.A. volume I(I) at 83–84. Subsequently, Jenrette was sentenced to two years' imprisonment and fined $30,000.

Jenrette appeals his conviction and the denial of his motion for acquittal or retrial. In addition to the three claims raised in his motion before the district court, Jenrette asserts that the district judge erred in refusing to instruct the jury on the defense of duress. For the reasons set forth below, we find Jenrette's contentions meritless. Accordingly, we affirm the conviction and the district court's judgment.

## II. ANALYSIS

### A. *Duress*

The defense of duress excuses criminal conduct only where the defendant committed the illegal action "under an unlawful threat of imminent death or serious bodily injury ...." *United States v. Bailey*, 444 U.S. 394, 409, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). If the defendant had any reasonable, legal alternative to committing the crime, the defense of duress will

---

**4.** *See* Transcript of Telephone Call of Jan. 25, 1980, J.A. III at 983–84; Transcript of Telephone Call of Jan. 25, 1980, J.A. III at 989; Transcript of Telephone Call of Jan. 26, 1980, J.A. III at 993–94.

not obtain. *Id.* at 410, 100 S.Ct. at 634. In most cases, a defendant need not produce strong evidence to obtain a jury instruction on duress. Where, however, the evidence is insufficient as a matter of law to support a finding of duress, the district court's refusal to instruct the jury on duress is not erroneous. *United States v. Shapiro,* 669 F.2d 593, 596–97 (9th Cir.1982). *See United States v. Peltier,* 693 F.2d 96, 98 (9th Cir.1982) (per curiam). *See also United States v. Bailey,* 444 U.S. at 412, 100 S.Ct. at 635.

Jenrette contends that he accepted the bribe only because he feared death or injury at the hands of Weinberg and Amoroso. According to Jenrette, Weinberg and Amoroso deliberately portrayed themselves as mobsters. Jenrette maintains that because he suffers from paranoia induced by alcoholism, this "gangster image" induced a reasonable fear of imminent danger. Jenrette testified that his fears were substantiated by a threat from Weinberg.[5]

■ We conclude that the evidence offered by Jenrette is insufficient as a matter of law to justify a finding of duress. Assuming that Jenrette reasonably believed Weinberg and Amoroso were gangsters and that this belief produced a reasonable fear, we still find no evidence that Jenrette was threatened with imminent bodily harm on December 6 when he accepted the bribe. Similarly, Jenrette cites no evidence in the record that a threat of imminent harm at the January 7 meeting caused him to suggest involving Senator Thurmond in the immigration deal.[6] Furthermore, Jenrette

does not argue that he had no reasonable, legal alternative to accepting the bribe money. As noted, the bribe was first offered at the December 4, 1979 meeting. Although Jenrette allegedly feared for his life, he did not accept the money on December 4. Instead, he left the townhouse and made arrangements for an intermediary to collect the money two days later. Even if Jenrette reasonably believed he was in imminent danger while at the townhouse, he has offered no explanation for his failure to take alternative action, such as notifying law enforcement officials, during the next two days.

Jenrette's actions belie his assertion that he acted under threat of imminent harm and that he had no alternative but to accept the bribe. Accordingly, we find, as a matter of law, that the cited evidence cannot support acquittal on the basis of duress. The district court, therefore, did not err in declining to instruct the jury on the defense of duress. *See United States v. Shapiro,* 669 F.2d at 596–97.

**B.** *Entrapment*

■ Entrapment occurs when a defendant commits a crime not due to any predisposition, but solely as a result of government inducement. *See United States v. Russell,* 411 U.S. 423, 428–29, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973). A defendant raises the issue of entrapment by producing evidence of government inducement. *United States v. Burkley,* 591 F.2d 903, 911–16 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979). Once the defendant

---

**5.** The "threat" Jenrette refers to consists of a statement made by Weinberg to John Stowe, Jenrette's co-defendant, during a phone conversation on December 4, 1979. The transcript reveals that Weinberg said: "[Y]ou gotta remember one thing now Tony [Amoroso] is a tough guy. He's [Jenrette] gotta ... tell us he's gonna do it." J.A. III at 712.

**6.** A defendant must show some threat of imminent harm to establish duress. A threat of future harm, or a threat made before the commission of the illegal act generally is not sufficient. *See* 1 Wharton's Criminal Law § 51 at 242–43 (C. Torcia 14th ed. 1978); *United States v. Atencio,* 586 F.2d 744, 746 (9th Cir.1978) (immediacy

is a crucial element of the duress defense). If the threat is not of immediate harm, there generally will be ample opportunity to avoid the illegal act. The only act or statement in the record that could even remotely be construed as a threat against Jenrette was made over the telephone before the December 4 meeting to a third person. *See* note 5 *supra.* Additionally, Jenrette testified that he received an unrecorded, threatening phone call sometime after Jan. 1, 1980 but *before* the Jan. 7, 1980 meeting. Trial Tr. (Jenrette) vol. XVI at 3415–17. Neither threat, however, was sufficiently immediate to justify the defense of duress.

properly raises the defense, the prosecution bears the burden of disproving entrapment by showing beyond a reasonable doubt that the defendant was predisposed to commit the crime. *Id.* at 915–16. Jenrette contends that the government failed to sustain its burden to prove predisposition. Consequently, Jenrette argues that, as a matter of law, the defense of entrapment bars his conviction.

We note at the outset that the scope of our review is limited. At trial, the issue of entrapment was submitted to and rejected by the jury.[7] We may overturn the jury's rejection of the entrapment defense only if no reasonable jury could have found that the government proved predisposition beyond a reasonable doubt based on the evidence produced at trial. *See United States v. Jannotti*, 673 F.2d 578, 599 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). After reviewing the record in this case, we conclude that there was ample evidence to support the jury's verdict.

A defendant is predisposed if he exhibits a " 'state of mind which readily responds to the opportunity furnished by the [government] to commit [the crime] ....' " *United States v. Burkley*, 591 F.2d at 916 (quoting *Hansford v. United States*, 303 F.2d 219, 222 (D.C.Cir.1962) (en banc)). Predisposition may be proved by showing that the defendant "responded affirmatively to less than compelling inducement ...." *Id.* at 916. Here, the videotape of the December 4 meeting and the taped phone conversations of December 5 and 6 demonstrate that Jenrette readily responded to the government's bribe. Jenrette's statements during the meeting indicate that he was well aware that the Abscam agents were offering a bribe and that accepting the bribe was illegal.[8] Although Jenrette refused to take the money on December 4, his assurances that he had "larceny in [his] blood" and his suggestion that a third person receive the money indicate that his refusal did not stem from an unwillingness to accept a bribe. Rather, Jenrette's own statements suggest that he refused the money only because he was concerned about his ability to perform his end of the bargain and because he wished to formally insulate himself from illegal activities. After accepting the bribe on December 6, Jenrette further exhibited a willingness to commit illegal acts by suggesting the possibility of bribing another government official. In light of this evidence, we cannot say that no reasonable jury could have found that Jenrette was predisposed to commit the crime.[9]

---

7. The district judge instructed the jury on both inducement and predisposition. The jury was instructed to consider first whether the evidence showed government conduct that could cause an undisposed person to commit a crime. If the jury found inducement, then it was instructed to determine whether Jenrette was in fact predisposed to take the bribe. Trial Tr. vol. XXII at 4748–50. By finding Jenrette guilty, the jury necessarily rejected the entrapment defense. We do not know, however, whether this defense was rejected because the jury did not find government inducement or because the jury concluded Jenrette was predisposed. The district judge, in his opinion denying Jenrette's motion for acquittal or for a new trial, concluded that there was sufficient evidence to support a finding of inducement. *Jenrette*, slip op. at 26, J.A. I at 45. In addressing Jenrette's entrapment argument, therefore, we will assume that inducement existed.

8. After discussing the immigration problems and indicating that he would like to study the immigration laws before accepting the money,

Jenrette stated: "I don't know that I've taken a bribe and I [don't know] that ... you've offered me a bribe." Transcript of Meeting of Dec. 4, 1979, J.A. III at 764. At one point during the meeting, Jenrette suggested that the money be paid to his lawyer. "[I]f I take it I'm gonna ... have a lawyer take it.... That's why I guess I'm hedgin[g] for a few hours. To get him here just to further cover [me] ... that he's takin[g] it as a legal fee ...." *Id.* at 760–61.

9. In rejecting Jenrette's post-trial argument that the government's failure to reveal certain evidence prejudiced this entrapment defense, the district judge noted: "it seems unlikely that any jury can seriously consider the defense of entrapment when they actually see the crime committed." *Jenrette*, slip op. at 54–55, J.A. I at 73–74. Jenrette argues that the district judge effectively concluded that video-tape evidence of a crime conclusively establishes predisposition. We do not, however, read the district court's ruling so narrowly. Rather, we believe a fair reading of the district judge's opinion reveals he

Jenrette argues, however, that the nature and scope of the government's inducement effectively negates this evidence of predisposition.[10] First, Jenrette contends that the government made several unsuccessful attempts to engage him in illegal conduct prior to the December 4 meeting. Second, Jenrette argues that after he refused the bribe on December 4, he was threatened by Amoroso and Weinberg until he accepted the bribe on December 6. Finally, Jenrette contends that the amount of the bribe was so excessive, especially in light of his financial and psychological condition, as to constitute compelling inducement sufficient to overcome the government's evidence of predisposition.

We are again mindful that we may overturn the jury's finding of predisposition only if no reasonable jury could have made such a finding in light of the evidence. The evidence adduced at trial does not conclusively establish that Jenrette was subjected to persistent attempted inducements.[11] Similarly, the transcripts of the recorded telephone conversations of December 5 and 6 contain no evidence that Weinberg or Amoroso employed threats to assure Jenrette's acceptance of the bribe. Transcripts of telephone conversations of Dec. 5 & 6, 1979, J.A. III at 779–824. We find this evidence insufficient to warrant overturning the jury's verdict.

Similarly, we must reject the claim that the amount of money offered as a bribe in and of itself shows a lack of predisposition. We need not determine here whether a promised monetary reward can ever be so substantial as to establish a lack of predisposition. We conclude only that under the circumstances of this case, the amount of the bribe was not so excessive as to mandate a finding that no reasonable jury could have found predisposition.

In sum, we find sufficient evidence to support the jury's rejection of the entrapment defense. Accordingly, we reject Jenrette's assertion that the evidence at trial established entrapment as a matter of law.

## C. Due Process

Jenrette further contends that the FBI's Abscam investigation, as directed toward him, was so outrageous that principles of due process bar his conviction. In *United States v. Kelly*, 707 F.2d 1460 (D.C. Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983), this court rejected a similar claim that the government's conduct of the Abscam investigation violated fundamental fairness.[12] The panel concluded that the due process clause bars a conviction only in the "rare instance of '[p]olice overinvolvement in crime' that

concluded only that the specific undisclosed evidence Jenrette sought was not strong enough in this case to overcome the evidence of predisposition established by the taped meeting of December 4 and phone conversations of December 5 and 6.

10. The government's actions toward the defendant can be relevant evidence in determining whether the government met its burden of proving predisposition. *United States v. Burkley*, 591 F.2d at 915–16. Where, for example, the government employed substantial pressure, or threats, the defendant's agreement to commit an illegal act may not be sufficient by itself to show predisposition. *Id.* at 916. Indeed, evidence of severe government coercion may be used by the defendant to rebut the government's evidence of predisposition. *Id.*

11. Jenrette testified at trial that in 1978 Stowe spoke to him about a scheme for importing certificates of deposit. Jenrette testified that he

wanted nothing to do with the scheme. Trial Tr. (Jenrette) vol. XV at 3278. This single incident, however, cannot establish a pattern of attempted inducements by the government.

12. In *United States v. Kelly*, 707 F.2d 1460 (D.C. Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983), the defendants claimed that the Abscam investigation was fundamentally unfair. Among the facts noted by this court concerning the manner in which the Kelly investigation was conducted were: 1) it was largely controlled by Weinberg, a convicted swindler; 2) inducements were offered to persons who were not suspected of previous wrongdoing; 3) decisions to offer inducements were based largely on the unverified word of various non-FBI middlemen; 4) there was little or no FBI supervision of the Abscam actors; 5) some of the conversations between Weinberg and the various defendants were unrecorded; and 6) bribes were offered more than once. *Id.* at 1471–73, 1474 & n. 1, 1475 n. 6.

reaches 'a demonstrable level of outrageousness.' " *Id.* at 1476 (quoting *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring)). The *Kelly* panel determined that such a level of outrageousness is not established by showing "obnoxious behavior or even flagrant misconduct on the part of the police[.]" *Id.* at 1476. Rather, due process guarantees are violated only in the narrow category of cases where the challenged conduct includes "coercion, violence, or brutality to the person." *Id.* (quoting *Irvine v. California,* 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1954)). Since the FBI's conduct toward Kelly did not involve "the infliction of pain or physical or psychological coercion," no due process violation existed. *Id.* at 1477.

Jenrette argues that *Kelly* is not dispositive of this case because the FBI's conduct toward him differed from that employed in the Kelly investigation. Specifically, Jenrette contends that the FBI "targeted" him with no "reasonable suspicion" that an investigation would reveal criminal behavior. In addition, Jenrette claims that the FBI failed to record certain phone calls that were critical to his defense.

 Contrary to Jenrette's assertion, claims of this kind were indeed raised in *Kelly.*[13] Even if we assume Jenrette has compiled more complete and detailed evidence of misconduct than was compiled in *Kelly,* we must still reject Jenrette's due process defense. The character and not the amount of the alleged misconduct is determinative in assessing the fundamental fairness of the investigation. Because none of these claimed instances of misconduct involve the type of coercion, violence, or brutality described in *Kelly,* they do not rise to the level of a due process violation. We therefore affirm the district court's conclusion that principles of due process do not bar Jenrette's conviction.

### D. *The* Brady *Claim*

Finally, Jenrette contends that the district court erred in denying his motion for a new trial based on the government's failure to comply with the disclosure requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* mandates that upon request the prosecution disclose any evidence favorable to an accused where that evidence is material either to guilt or to punishment. *Id.* at 87, 83 S.Ct. at 1196.

 In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court clarified the materiality aspect of *Brady*'s disclosure requirement. Where a defendant has made a request for *specific* information that is not disclosed, that information is considered material if it *might* have affected the outcome of the trial. *Id.* at 104, 96 S.Ct. at 2397. Where the defendant has made no request or a general request for exculpatory evidence, the undisclosed evidence is material only if, in the context of the entire record, it creates a reasonable doubt as to the defendant's guilt. *Id.* at 112–13, 96 S.Ct. at 2401–02. There is some disagreement as to whether Jenrette specifically requested all the undisclosed information.

---

**13.** The defendants in *Kelly* claimed that the FBI violated due process by proceeding with the investigation despite a lack of reasonable suspicion of wrongdoing and by failing to record all phone conversations. In concluding that the Abscam operators' investigation of Kelly did not violate principles of fundamental fairness, the court necessarily rejected the argument that lack of suspicion and failure to record constitute due process violations. Subsequent to our decision in *Kelly,* we ruled in yet another Abscam case that the failure to record certain telephone conversations did not violate principles of fundamental fairness. *United States v.*

*Weisz,* 718 F.2d 413, 435–37 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, ——, 104 S.Ct. 1285, 1305, 79 L.Ed.2d 688, 704 (1984).

At least two other courts of appeal have considered and rejected the contention that the government must have a reasonable suspicion of wrongdoing before offering a bribe to a public official. *See United States v. Myers,* 692 F.2d 823, 835 (2d Cir.1982), *cert. denied,* —— U.S. —— ——, 103 S.Ct. 2437–38, 77 L.Ed.2d 1322 (1983); *United States v. Jannotti,* 673 F.2d 578, 608–09 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

We need not resolve this question, however, because a new trial is not warranted under either standard.

After a lengthy hearing and after examination of voluminous records and materials, the district court concluded that if the government had disclosed the alleged *Brady* information, the outcome of the trial would not have changed. *United States v. Jenrette*, Cr. No. 80–289, slip op. at 55 (D.D.C. July 30, 1983); J.A. I at 74. The district judge is, of course, best suited to evaluate the significance of the undisclosed material. His judgment accordingly deserves great deference. *See United States v. Provenzano*, 615 F.2d 37, 49 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). We thus will not overturn the district court's judgment absent convincing evidence that the undisclosed information would have affected the outcome of the trial. After examining the *Brady* material, we find ample support for the district court's ruling.

First, Jenrette contends that the government failed to disclose evidence indicating that he was "targeted" by the FBI. The undisclosed evidence includes: 1) statements by Weinberg and an FBI agent that the FBI wanted to "get" Jenrette; 2) statements indicating that Abscam operatives knew Jenrette was under investigation in South Carolina; 3) a May 8, 1979 teletype from the South Carolina FBI office advising Abscam operatives that Jenrette was a close associate of two Abscam subjects; and 4) a May 1979 teletype recommending a bonus in part for Weinberg's discovery that Jenrette was in financial trouble and willing "to do favors." Jenrette maintains that this evidence implies a lack of predisposition and thus supports his entrapment defense.

Evidence of Jenrette's resistance to persistent FBI inducements to involve him in unlawful conduct prior to the December 4, 1979 bribery could bear on the question of Jenrette's criminal predisposition. The cited undisclosed statements and teletypes, however, do not establish that the FBI offered any inducements prior to December 4, 1979 or that Jenrette resisted such offers. At most, the undisclosed information may indicate some FBI interest in Jenrette before November 1979 or that Weinberg had disclosed information designed to generate interest in Jenrette before that time. Because we do not believe the undisclosed evidence is relevant to the issue of Jenrette's predisposition, we find no error in the district court's determination that the nondisclosure of this evidence provided no basis for a new trial.[14]

The second category of undisclosed evidence concerns Weinberg's activities during the Abscam operation. Jenrette points to evidence that Weinberg was running a "double scam." Jenrette asserts that Weinberg would help create phony certificates of deposit, induce people to circulate the certificates, and then collect a bonus from the FBI for removing the certificates from circulation. Jenrette asserts that the FBI failed to disclose documents indicating that it knew of this scam and a teletype stating that the purpose of his scam was to provide a method for introducing undercover agents to politicians.

This evidence pertains to the *conduct* of the Abscam investigation. The undisclosed documents are thus relevant to Jenrette's claim that flagrant misconduct during the investigation violated his right to due process. Because the false certificate scheme does not amount to "physical or psychological coercion," the undisclosed evidence regarding the scheme could not have established a due process violation. *See United States v. Kelly*, 707 F.2d at 1477. Since disclosure of this evidence could not have affected the outcome of Jenrette's trial, we find no error in the district court's determination that a new trial was not warranted.

---

14. If anything, this undisclosed evidence bears on Jenrette's claim that the Abscam investigation violated due process. As noted, however, FBI conduct that does not inflict pain or physical or psychological coercion does not constitute a due process violation. *See* section II C *supra*.

The third category of undisclosed evidence concerns the Abscam operatives' failure to record all telephone conversations with Jenrette and Stowe. Two Abscam prosecutors testified at the post-trial hearing that they discerned a pattern of unreported phone conversations notwithstanding instructions that all conversations were to be recorded. *See, e.g.,* Transcript of Due Process Hearing of May 12, 1981 at 202. Again, this evidence concerns the fundamental fairness of the investigation and is thus relevant to Jenrette's due process claim. This court has already ruled in the context of other Abscam cases that the failure to record some phone conversations does not violate principles of due process. *United States v. Weisz,* 718 F.2d 413, 435–37 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, ——, 104 S.Ct. 1285, 1305, 79 L.Ed.2d 688, 704 (1984); *see also United States v. Kelly,* 707 F.2d 1460, 1472–76 (D.C.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983). Since this information could not have affected Jenrette's conviction, its nondisclosure does not violate *Brady.*[15]

Fourth, the defense claims that the government failed to disclose the previously noted May 9, 1979 teletype reporting that Jenrette was in financial difficulty and a November 20, 1979 teletype indicating that Jenrette was involved in an obstruction of justice charge. According to Jenrette, these two teletypes prove his stressful condition and are thus relevant to the duress defense. These teletypes, however, fail to establish a serious threat to Jenrette's safety or that Jenrette had no legal alternative to accepting the bribe. This undisclosed evidence therefore could not support exoneration based on duress and thus does not warrant a new trial.

Finally, Jenrette argues that the government did not disclose certain evidence pertinent to Weinberg's credibility. This evidence consists of payments from the Miami FBI office to Weinberg, evidence that Weinberg kept gifts solicited for his fictitious Arab clients, and Weinberg's statement that if he didn't "coach" persons accepting bribes, there would be no case. Although such evidence could impugn Weinberg's character, his credibility could not be undermined more than it already had been by his sporadic memory, criminal background, and dubious motives. As the district court observed, "there seemed little to support the credibility of Weinberg.... [H]e had convenient lapses of memory, and he had a motive to lie. Moreover, his credibility was impeached by his background, a convicted con man, who stood to gain not only more money from Abscam depending upon how many government officials he could bring into the net, but some form of absolution from his probation requirements." *Jenrette,* slip op. at 53–54, J.A. I at 72–73. The district court concluded, and we agree, that the voluminous evidence introduced at trial so completely undermined Weinberg's credibility that any additional information concerning payoffs or solicited gifts could not have affected the outcome of the trial.

■ In sum, we agree with the district court's conclusion that the undisclosed evidence would not have affected the outcome of the trial and thus does not meet the materiality requirement of *Brady.* We therefore see no basis to grant a new trial based on the government's alleged failure to disclose this information.

## III. Conclusion

For the foregoing reasons, Jenrette's conviction and the district court's denial of his motion for acquittal or new trial are

*Affirmed.*

---

**15.** The FBI's failure to record phone conversations could be relevant to show that Abscam agents' lack of credibility. The trial testimony, however, clearly established that the Abscam operatives failed to record all phone conversations and even lost tapes of some conversations. *See, e.g.,* Trial Tr. vol. VIII at 1542–49 (Amoro-so) and 1569–74 (Weinberg). Any evidence that two prosecutors, who were not even involved in Jenrette's case, concluded that in general there were unrecorded phone conversations in the Abscam investigation would have been only cumulative and would not have affected the outcome of the trial.