947 F.2d 942
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph DiCAPUA, Defendant-Appellant.
 No. 91-5626.
 United States Court of Appeals, Fourth Circuit.
 Argued Aug. 2, 1991.
Decided Oct. 31, 1991.
As Amended Nov. 25, 1991.
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Elkins. Robert R. Merhige, Jr., Senior District Judge. (CR-89-156)
 Argued: Steven Morris Askin, Askin, Pill, Scales & Burke, L.C., Martinsburg, W.Va., for appellant; Sherry L. Muncy, Assistant United States Attorney, Elkins, W.Va., for appellee.
 On Brief: William A. Kolibash, United States Attorney, Elkins, W.Va., for appellee.
 N.D.W.Va.
 AFFIRMED.
 Before DONALD RUSSELL and WIDENER, Circuit Judges, and FALCON B. HAWKINS, Chief United States District Judge for the District of South Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Joseph DiCapua appeals various aspects of his extortion-related convictions. On October 9, 1989, a jury returned a verdict, finding DiCapua guilty of one count of conspiracy to commit extortion in violation of 18 U.S.C. § 875(b) and 18 U.S.C. § 371. The jury also convicted DiCapua of eight counts of aiding and abetting extortion in violation of 18 U.S.C. § 375(b) and 18 U.S.C. § 2. DiCapua was sentenced to 46 months in prison and three years of supervised release. Finding no error, we affirm.
 
 I.
 
 2
 The indictment charged that from on or about May 11, 1989 until May 16, 1989, appellant conspired to knowingly and intentionally transmit, in interstate commerce, a communication containing threats to injure another person, with the intent to extort money from another person. The eight telephone calls listed as overt acts for the conspiracy charge formed the basis for the eight counts of aiding and abetting extortion.
 
 
 3
 In broad terms, the conspiracy sought to force the victim, Michael Duffy, ("Duffy") into paying a large sum of money to Joseph DiCapua, ("DiCapua") the defendant. To complete this goal, an unknown caller repeatedly telephoned Duffy and told him to pay the money or he and his family would be killed. The calls stopped after DiCapua was arrested at the airport in Florida where he was to meet Duffy.
 
 
 4
 The calls began on May 10, 1989. The first call was made to the office of Renata Duffy, Duffy's wife. The call was answered by Michael Mertz, Renata Duffy's boss. Mertz stated that the caller said, "If you don't follow my instructions within 72 hours, you are going to be in deep [expletive]." The caller later asked Mertz if he recalled a Mr. DiCapua or a name similar to that and began talking about money owed to Mr. DiCapua. Mertz then testified that the caller later asked if he was Mike Duffy, and he said "No, this is Mike Mertz." He was then told by the caller to forget the call.
 
 
 5
 Duffy testified about his substantial business dealings between his family and the DiCapuas. Duffy then testified that he was told by the unknown caller, also on May 10: "That he was representing the DiCapuas. And that I had 72 hours to obtain a large sum of money. And if I didn't, he was going to kill myself and my family. And he listed my mother, my father, all my brothers, my sister, told me where they worked, told me my social security number, went so far as to tell me what pre-school my little ones were in. He was an animal. He was really just an animal." The calls which formed substantive counts of the indictment followed.
 
 
 6
 The next day, Duffy's wife testified that she was called at work. After being asked to identify herself and doing so, the caller told her that twenty-four hours out of the seventy-two were up. He said that they were in "deep [expletive]" and that what they had done was a terrible, terrible thing to the DiCapuas. The caller went on to threaten to break her husbands knee caps, kill him, and then he would go down the line to their children and family.
 
 
 7
 At this point, Duffy went to the police, and the police sent him to the Federal Bureau of Investigation ("F.B.I."). The F.B.I. gave him a tape recorder, and these tapes were admitted into evidence at trial.
 
 
 8
 Duffy recorded his subsequent phone conversations with this unknown caller. The next call came on May 11, 1989, at approximately 7:18 p.m., and the unknown caller stated that he had documentation which showed that Duffy owed money to DiCapua. The caller repeated the demand for payment, under sanction of veiled threats. On May 11, 1989 at 8:05 p.m., Duffy received another call from the unknown caller, stating that he was working for the DiCapuas and that Duffy better take the money to them in Florida within 42 hours.
 
 
 9
 On May 13, 1989, at 9:45 a.m., Duffy called DiCapua in Florida to ask for an explanation and DiCapua replied: "I can't talk about it." On May 13, 1989, at approximately 11:29 a.m., Duffy received a telephone call at his residence from the same unknown caller who instructed Duffy to take a particular flight to Florida to deliver the money to DiCapua. On May 15, 1989, at 8:10 p.m., Duffy received a telephone call at his residence from the same unknown caller, who stated that "whoever it's gonna be that's gonna blow you away, is gonna act in good faith too," if Duffy did not pay the money.
 
 
 10
 On May 16, 1989, at 1:25 p.m., Duffy received a telephone call at his residence from the same unknown caller who stated: "Your friend is waiting for you to call." The caller then instructed Duffy to contact DiCapua. On May 16, 1989, at 1:30 p.m., Duffy called DiCapua in Florida and DiCapua told him to fly to Florida and they would talk about the demand for money.
 
 
 11
 These calls formed the basis of the convictions. After the F.B.I. became involved, they instructed Duffy to take the money to the requested destination, Florida, and deliver partial payment. Defendant was arrested at the airport, the place where he had agreed to meet Duffy. Defendant had a note with him which evidenced a debt between Duffy and the defendant, and the note said that $23,000 would be accepted as part payment.
 
 II.
 
 12
 On appeal, appellant asserts error in regard to the following points: (A) there was insufficient evidence to show that DiCapua was part of a conspiracy; (B) the government failed to show that the calls occurred in interstate commerce as opposed to intrastate as required by 18 U.S.C. § 875(b); (C) there was no evidence to support that DiCapua aided or abetted the unknown caller; (D) the district court erred in denying DiCapua's motion for new trial; (E) the district court erroneously admitted evidence that the calls stopped after DiCapua was arrested; (F) the district court erroneously refused to consider the defendant's statement in calculating the defendant's sentence.
 
 A.
 
 13
 Appellant claims that there was insufficient evidence to link him with the conspiracy. Our review on this issue is limited to determining "whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).
 
 
 14
 In the government's case, Duffy and his wife testified that they had been personal friends with the defendant and that their business with the defendant had lost a substantial amount of money. The caller repeatedly stated that he was working for the defendant. The caller instructed Duffy that your friend is waiting for you to call. When Duffy called the defendant to talk about the problem, he responded that "I can't talk about it." The defendant did not inquire of his friend as to the circumstances of the problem, but said he could not talk about it.
 
 
 15
 The calls occurred over eight days, and ended as Duffy called the defendant to make flight arrangements to come to Florida to make a payment on the debt. The defendant was arrested at the airport in Florida, the place where the caller had told Duffy to take the money. The defendant was arrested with a note which stated that he would accept $23,000.00 as partial payment. The caller never requested anything for himself but only for the defendant.
 
 
 16
 Viewing the facts as a whole, there is ample evidence to link the defendant with the conspiracy. The gist of the offense of conspiracy is an agreement, United States v. Norris, 749 F.2d 1116, 1121 (4th Cir.), cert. denied, 471 U.S. 1065 (1984), and it is well established that the agreement can be proved by circumstantial evidence. Glasser v. United States, 315 U.S. 60, 80 (1942). In sustaining a conspiracy conviction, "there need only be a showing that the defendant knew of the conspiracy purpose and some action indicating his participation." United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir.1984), cert. denied, 469 U.S. 1105 (1985). The taped demands for money in exchange for safety from attack provided circumstantial evidence of the agreement and participation. For instance, on May 16, 1989, at 1:25 p.m., the caller states: "Listen, your friend is waiting for you to call. Call him now." Five minutes later, Duffy called the defendant and says: "I was told to call you." Defendant's response: "Right, I was told to ah, I spoke to, and the fact is I'd like you to come down." When the defendant was arrested, he had the note for partial payment with him in the car.[1]
 
 B.
 
 17
 Second, relying heavily on United States v. Korab, 893 F.2d 212 (9th Cir.1989), the defendant contends that the government never showed the calls in this case occurred in interstate commerce as opposed to intrastate commerce. In addressing a Hobbs Act extortion conviction, this Court has required an interstate commerce link for jurisdiction: "[I]n each case, ... a nexus has been required between the extortionate conduct and interstate commerce in order to establish federal jurisdiction. That nexus may be de minimis, but it must nonetheless exist." United States v. Buffey, 899 F.2d 1402, 1404 (4th Cir.1990). In reviewing the evidence on an aiding and abetting charge, this court has said: " '[it] need only be established that the act constituting the offense was in fact committed by someone.' " United States v. Meinster, 619 F.2d 1041, 1046 (4th Cir.1980), quoting Meredith v. United States, 238 F.2d 535, 542 (4th Cir.1956). An individual is guilty of federal extortion if "with the intent to extort from any person, firm, association, or corporation, any money or other thing of value, [he] transmits in interstate commerce any communication containing any threat ... to injure the person of another shall be fined or imprisoned ... or both." 18 U.S.C. § 875(b) (emphasis added).
 
 
 18
 The government says that it met the requirements of the statute by proving, albeit by circumstantial evidence, that the calls occurred interstate rather than intrastate. The government says this proof came from the calls themselves. The government does not rely on any calls made by Duffy to the defendant. Instead, the government relies on the calls from the unknown caller who always said to come down here, come to Florida, and to bring the money to Florida.
 
 
 19
 These calls from the unknown caller distinguish this case from Korab, supra. In Korab, the defendant hired Moradians and Fambrough in Los Angeles to extort money from Rubinstein, the defendant's neighbor in Phoenix. In alleging extortion, the government sought to show three examples of interstate phone threats: 1) in a call from Moradians in Los Angeles to Rubinstein in Arizona; 2) in a call from Moradians to Rubenstein to make sure he kept quiet about the extortion; and 3) various interstate telephone calls to solicit and plan the extortion between the co-defendants.
 
 
 20
 The Ninth Circuit held that none of these calls satisfied the statute. The problem with the first example was that Moridians testified that no threats or demands for money occurred in this call, only questions about logistics. Call number two would not meet the statute's requirements because the court thought the extortion was complete after Rubenstein paid the money. The indictment sought money in exchange for not killing Rubenstein so that a threat to keep Rubenstein quiet after the money was already exchanged fell outside the scope of the indictment. Hence that call could not satisfy the statute's interstate call requirement. Id. at 214. As to the third group of calls, those between the co-defendants, the court found that the language of the statute required a call to be between the defendant and the victim. Id. at 215. Hence, the calls between co-defendants, though interstate, did not satisfy the statute.
 
 
 21
 The facts of the present case are different from those in Korab. In this case, the government did not rely on mere logistical calls which lacked threats, on calls made after the completion of the extortion, or on calls between co-defendants. Instead the government presented evidence from which a jury could infer that the calls from the unknown caller to Duffy, which unquestionably contained threats, came in interstate commerce.
 
 
 22
 The defendant argues that there was never any direct proof that the calls went interstate. For instance, the government was only able to trace the calls back to a long distance trunk line, a fact which could show an intrastate call just as easily as an interstate call. Nonetheless, there were facts from which the jury could reasonably infer that the calls from the unknown caller were interstate calls.
 
 C.
 
 23
 Third, the defendant contends that there was insufficient evidence presented to show that the defendant aided or abetted the unknown caller and that the appellant knew threats or extortion were being used.[2] Again, the standard for reviewing this point comes from Jackson, supra. As this Court has recently stated: "Simply put, 'aiding and abetting means to assist the perpetrator of the crime.' " United States v. Horton, 921 F.2d 540, 543 (4th Cir.1990), quoting United States v. Williams, 341 U.S. 58, 64 (1951). Furthermore, for an aiding and abetting conviction, "the government need not prove the identity of the actual principal, 'provided the proof shows that the underlying crime was committed by someone.' " Id., quoting United States v. Perry, 643 F.2d 38, 45 (2d Cir.1981). The government showed, by circumstantial evidence, that the defendant knew that threats were being made by the caller to Duffy. Following these threats, Duffy called the defendant, his one time friend and business partner, and said: "Joe, just tell me the kids are alright." Defendant responded: "I can't talk about it." The defendant later arranged for Duffy to bring money down to Florida. Viewing these facts in the light most favorable to the government, as we must, the court is convinced that a jury could have rationally convicted the defendant on this count.
 
 D.
 
 24
 Fourth, the defendant contends that the district court abused its discretion in not granting the defendant a new trial. As has been previously noted, there was ample evidence for the government's theory that defendant combined with an unknown caller to extort money from Duffy by use of threats. The jury was entitled to so find, and it was not an abuse of discretion for the district court to deny the motion for a new trial. See United States v. Jenrette, 744 F.2d 817, 825 (D.C.Cir.1984) (Abuse of discretion is standard of review for denial of a motion pursuant to Fed.R.Crim.P. 33).
 
 E.
 
 25
 Fifth, the defendant contends that the district court erred in admitting evidence that the calls stopped after the defendant was arrested. Evidence is relevant if it "tends to make the existence of any fact more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The judge ruled that the fact that the calls ended following the arrest of the defendant was a fact for the jury to consider if they so chose. The defendant contends that this fact was prejudicial. Although this fact may have been prejudicial in the sense that any good evidence against a person is prejudicial, it was not an abuse of discretion to allow it into evidence.
 
 F.
 
 26
 Sixth, the defendant contends that the district court erred in admitting evidence of defendant's link to the MAFIA and in permitting statements of a co-conspirator. As to the alleged MAFIA connection, on direct examination, Duffy testified:
 
 
 27
 Did he [defendant] ever speak with you regarding organized crime?
 
 
 28
 Answer: Yes, ma'am.
 
 
 29
 Question: What did he say to you?
 
 
 30
 Answer: He had a business venture with another couple, an ice cream store, and they had a falling out type of thing. And he was basically, I will call my cousin Rob at the time, and he will take care. [sic]
 
 
 31
 Question: What did he mean?
 
 
 32
 Answer: Rob was supposedly the gentleman that was connected, that and another uncle that is in a similar type of business.
 
 
 33
 Question: You are not telling the jury that he did that, you are saying that you had that conversation?
 
 
 34
 Answer: Just had that conversation. Did nothing to my knowledge.
 
 
 35
 A district court has broad discretion under Rule 404(b) to weigh the prejudice of evidence to determine admissibility. United States v. James, 911 F.2d 725, 732 (4th Cir.1990); United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988). Defendant complains that he never received a Fed.R.Evid. 404(b) hearing to show that the prejudice outweighed the probative value of this line of questioning. Yet, it is clear that the court considered the evidence in light of the appellant's objection and made a ruling accordingly based on the argument before him. See United States v. Watford, 894 F.2d 665, 671 (4th Cir.1990) (evidence of prior bad acts properly admitted to show knowledge of plan or scheme). Furthermore, there was ample evidence that the defendant was part of this conspiracy which would have allowed into evidence the statement of his co-conspirators. On the whole, it was not an abuse of discretion to admit these pieces of evidence.
 
 G.
 
 36
 Finally, the government contends that the district court did not err in sealing a letter from the defendant, before the judge had read it, which was submitted to the probation department and allegedly disparaged Duffy. This letter allegedly also contended that the defendant was innocent and detailed the defendant's relationship with Duffy. The sentencing judge refused to read the letter, but said he would hear whatever counsel had to say. Consistent with United States v. Miller, 849 F.2d 896 (4th Cir.1988), the defendant was allowed to speak before he was sentenced, and the judge listened to the argument of counsel before the judge passed sentence. The defendant, or his counsel, was free to express the contents of the letter at this time; and therefore, there was not an abuse of discretion.
 
 
 37
 Accordingly, for the reasons discussed above, DiCapua's conviction is
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 Despite defense counsel's failure to object to the admission of this note, the defendant contends that it was plain error for the court to have admitted the note. We find that the note would have been admissible pursuant to a search of the car incident to a lawful arrest. United States v. Ross, 102 S.Ct. 2157 (1982). Therefore, there is no merit to defendant's plain error argument in regard to this note
 
 
 [2]
 18 U.S.C. § 2 states: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal."