TATEL, Circuit Judge,
dissenting:
Born, raised, and educated in Nigeria, Queen Nwoye came to the United States only five years before the events in this case. At her trial, Nwoye took the stand and gave a harrowing account of her rela *467 tionship with her boyfriend Adriane Osuagwu — testimony that we must accept as true for purposes of the issue before us. United States v. Glover, 153 F.3d 749, 752 (D.C.Cir.1998). According to Nwoye, Osuagwu regularly assaulted her, “slugg[ing]” and “beating” her even “for little arguments.” Trial Tr. at 371, 391, 393 (Nov. 1, 2007). He controlled her finances, used her ATM card, charged her credit cards, and told her how to spend her money. She testified that Osuagwu “was in total control,” id. at 370, monitoring her constantly and forcing her not only to keep her phone on and answer immediately, but also to stay on the phone with him via Bluetooth headset during her nursing school classes.
When Osuagwu learned that Nwoye had had a previous affair with a married man, Ikemba Iweala, he demanded that she introduce him to Iweala. Osuagwu suspected that Iweala would be willing to pay a handsome amount to keep the affair secret. When Nwoye refused to make the introduction, Osuagwu beat her, she capitulated, and the extortion began. When she later resisted continuing with the plot, Osuagwu beat her until she was “helpless.” Id. at 373. Each time Nwoye met with Iweala, Osuagwu either accompanied her or, as Nwoye’s phone records confirm, monitored her by phone. He hit her when she failed to “do [her part) right” and threatened to “strangle” and “bury [her] right in [her] house” if the scheme was exposed. Id. at 374, 381. “I was so scared. I didn’t know who to talk to.” Id. at 380. She followed Osuagwu’s instructions because “I was scared. I was so scared of this guy.” Id. at 371.
Nwoye testified that Osuagwu told her that he worked for the FBI. Asked by the government why she never called the police about the extortion or Osuagwu’s threats, Nwoye explained that she thought that police “all work together for the government” and that reporting him would lead to “more trouble.” Id. at 417. “It’s not easy,” she testified. “This is an FBI guy. He would find out.” Id. at 400. When the prosecutor pointed out that law enforcement agents could be arrested if reported, Nwoye responded, “Who are you going to tell?” Id.
Based on this testimony, Nwoye requested a duress instruction. The district court refused, and the jury convicted her.
* * *
Duress is a classic affirmative defense. To prevail on a duress defense, a defendant must convince the jury that (1) she “acted under the threat of immediate death or serious bodily injury,” United States v. Gaviria, 116 F.3d 1498, 1531 (D.C.Cir.1997) (per curiam), and (2) that she “had no reasonable legal alternative to committing the crime,” id., ie., no “chance both to refuse to do the criminal act and also to avoid the threatened harm,” United States v. Bailey, 444 U.S. 394, 410, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (internal quotation marks omitted). “[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.” Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). To obtain a duress instruction, a defendant “need not produce strong evidence.” United States v. Jenrette, 744 F.2d 817, 821 (D.C.Cir.1984); see also United States v. Riffe, 28 F.3d 565, 570 (6th Cir.1994) (“so long as there is even weak supporting evidence, refusal to give the instruction is reversible error” (internal quotation marks omitted)), abrogated on other grounds by Dixon v. United States, 548 U.S. 1, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006). Because “in a criminal case the law assigns [the fact-finding function] solely to the jury,” Sandstrom v. *468 Montana, 442 U.S. 510, 523, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)—and indeed because criminal defendants like Nwoye enjoy a constitutional right to trial by jury — a district court may not refuse a duress instruction unless “the evidence is insufficient as a matter of law to support a finding of duress.” Jenrette, 744 F.2d at 821.
Given our obligation to take Nwoye’s testimony as true and to view all evidence in the light most favorable to her, the record contains more than enough evidence to have warranted a duress instruction. Nwoye testified that Osuagwu repeatedly beat her and threatened to kill and bury her in her own house unless she followed through with the extortion. This threat is hardly vague or speculative. By any definition, it qualifies as “act[ing] under the threat of immediate death or serious bodily injury.” Gaviria, 116 F.3d at 1531. This case is thus nothing like Jenrette where the defendant presented no specific reason to fear bodily harm except that he heard the bribe-giver was “a tough guy.” 744 F.2d at 821 & n. 5.
The only question, then, is whether Nwoye had a reasonable legal alternative to committing the crime. The government presents a sensible legal alternative: call the police! And the court agrees, as do I, that calling the police would have been a wise choice. But Nwoye has a response. Because she believed that Osuagwu worked for the FBI, she feared not only that anything she reported to the police would get back to him and that he would kill her, but also that — and again because she thought he was part of the FBI — the police would neither protect her nor investigate him. “This,” she testified, “is an FBI guy. He would find out.” “Who are you going to tell?”
To the American-born, highly educated, legally sophisticated judges of this court, Nwoye’s fears are unreasonable. They fault her for “provid[ing] no evidence of corruption beyond her eonclusory assertion that police and FBI ‘all work together for the government’ and that anything she told the authorities would find its way to Osuagwu.” Maj. Op. at 465. But to obtain a duress instruction, she needed no evidence that police were actually corrupt or that they actually worked together or that they would actually tell Osuagwu that she reported him. She needed only a reasonable belief that the police would refuse to protect her, and reasonableness is quintessentially a question for the jury. United States v. Gaudin, 515 U.S. 506, 512, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (“[Djelicate assessments of the inferences a reasonable decisionmaker would draw from a given set of facts and the significance of those inferences to him is peculiarly one for the trier of fact.” (alterations, omission, and internal quotation marks omitted)); see also United States v. Duncan, 850 F.2d 1104, 1117 (6th Cir.1988) (The test for sufficiency to reach a jury “[cjertainly ... cannot be one of reasonableness. It is not for the judge, but rather for the jury, to appraise the reasonableness or the unreasonableness of the evidence.... To hold otherwise would be tantamount to a grant of partial summary judgment to the Government in a criminal case.” (internal quotation marks omitted)). And a jury of Nwoye’s peers, reflecting “the commonsense judgment of a group of laymen,” Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), might well view the record very differently than do the judges of this court. The jury, observing the testimony of an abused woman and recent immigrant subject to the brutal control of a man she believed was part of American law enforcement and forced by him to participate in an unlawful conspiracy, might well believe her and conclude that she actually thought — and given her situation, reasonably thought — that *469 any attempt to call the authorities would end in her ruin. See McCleskey v. Kemp, 481 U.S. 279, 311, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (“[JJurors bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.” (internal quotation marks omitted)); Taylor v. Louisiana, 419 U.S. 522, 532 n. 12, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (the jury’s “perspective on human events ... may have unsuspected importance” to a defendant); see also Oral History: Judge William B. Bryant (1911-2005) at 146, available at http:// www.dcchs.org/WilliamBBryant/William BBryant_complete.pdf (“I’ve known judges who would be completely horrified and think you were out of your mind if you indicated that you thought from time to time a policeman wasn’t telling the truth. And they couldn’t understand why anybody would disbelieve a policeman. A lot of jurors know better. They have been around, and they have seen what happens in the streets and some of them have been exposed to some things.... ”).
None of the cases the court cites support taking the question of reasonableness from the jury. In Jenrette, the defendant testified that he was under duress to accept a bribe because the two bribe-givers “deliberately portrayed themselves as mobsters” and that “because he suffers from paranoia induced by alcoholism, this ‘gangster image’ induced a reasonable fear of imminent danger.” 744 F.2d at 821. Instead of dismissing this belief — as this court dismisses Nwoye’s — we assumed its reasonableness. See id. (“Assuming that Jenrette reasonably believed Weinberg and Amoroso were gangsters and that this belief produced a reasonable fear....”). Even so, we rejected the duress instruction because the defendant — unlike Nwoye — “ha[d] offered no explanation for his failure to take alternative action, such as notifying law enforcement officials.” Id. In Gaviria, we rejected a duress instruction because although the defendant claimed that prison officials were corrupt, he offered no explanation for failing to go to others despite “ample opportunities” to do so in unmonitored meetings or conversations. 116 F.3d at 1531. In sharp contrast, Nwoye offered a specific explanation for why she thought contacting authorities herself or having an acquaintance do so would be of no help. The record, moreover, provides no support for the claim that there were “relatives, classmates, and teachers with whom she could seek refuge.” Maj. Op. at 465.
Nor do the two out-of-circuit cases the court cites support its position. Both lack the evidence lying at the very heart of this case: testimony that contacting the authorities would provoke, rather than prevent, the threatened act. See United States v. Alicea, 837 F.2d 103, 105-06, 107 (2d Cir.1988) (explaining that, unlike the defendant in a Ninth Circuit case who believed authorities worked with the threateners, these defendants “presented no such special circumstances,” and detailing defendants’ opportunities to safely contact various authorities); R.I. Recreation Ctr., Inc. v. Aetna Cas. & Sur. Co., 177 F.2d 603, 604-06 (1st Cir.1949) (denying defense of coercion in a civil insurance suit where plaintiff contended its manager acted under gangsters’ threats, but never stated that contacting the police would be dangerous or ineffective, and manager had “ample” opportunities to call the police while “walking over a mile to his rendezvous with the bandits”). This also explains why a jury, if given a chance to consider the question, could conclude that Nwoye’s “fail[ure] to take any advantage of Osuagwu’s” trip to California was, under the circumstances, perfectly understandable. Maj. Op. at 464. True, Nwoye had time to *470 call the police in Osuagwu’s absence. But because she feared that the police would not protect her and that Osuagwu would learn of any contact with the authorities, the beatings — and perhaps even her murder — were inevitable if she did call the police.
Finally, our sister circuits have required duress instructions in circumstances similar to Nwoye’s. In United States v. Contento-Pachon, the Ninth Circuit held that the defendant, who testified that he believed police in Colombia served as paid informants for drug traffickers, was entitled to a duress instruction because although he had time to contact these authorities or to flee with his wife and three-year-old child, “[a] juror might find that this was not a reasonable avenue of escape.” 723 F.2d 691, 694 (9th Cir.1984). In United States v. Riffe, the defendant, a prisoner threatened by a prison gang, feared going to prison officials because they might not keep his statements secret and protective custody might fail to keep the gang at bay. 28 F.3d at 568. The Sixth Circuit held that the defendant was entitled to a duress instruction because a jury, not the court, should assess whether he “had nowhere to turn in the prison for safe haven.” Id. at 570.
* * *
Nwoye’s claim is simple and fundamental to the criminal process. She asks that her defense of duress be heard by a jury of her peers. To be sure, had the district court given a duress instruction, the jury might have disbelieved her or found her fears to be unreasonable. But it is the jury’s job to make that decision, not this court’s to decide how it would vote in a juror’s place. I dissent.