UNITED STATES of America,

v.

Richard KELLY, Appellant.

No. 84–5035.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 2, 1984.
Decided Nov. 16, 1984.

692

Before BORK and SCALIA, Circuit Judges, and GESELL, District Judge of the United States District Court for the District of Columbia.*

Opinion for the Court filed by District Judge GESELL.

GESELL, District Judge:

Former Congressman Richard Kelly has appealed his conviction by a jury on three counts charging conspiracy to commit bribery and to defraud the United States,[1] bribery,[2] and interstate travel to engage in bribery.[3] He primarily contends that the evidence of his entrapment by the Federal Bureau of Investigation was so overwhelming that no reasonable jury could have failed to have a reasonable doubt as to his guilt. After carefully examining the evidence, we have concluded for the reasons set out below that the jury had ample evi-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

1. 18 U.S.C. § 371.

2. 18 U.S.C. § 201(c)(2).

3. 18 U.S.C. § 1952.

dence to find that Congressman Kelly was not entrapped. Because all his grounds for appeal completely lack merit, we affirm the conviction.

## I. The Facts

This Court has already had occasion to summarize the basic facts of this case in *United States v. Kelly,* 707 F.2d 1460, 1461–67 (D.C.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983),[4] and *United States v. Weisz,* 718 F.2d 413, 416–24 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984),[5] and to discuss general background of the FBI Abscam investigation out of which it arose in these and other cases.[6] Only those facts that bear on Kelly's claims on this appeal need be brought into focus here.

On January 8, 1980, the FBI secretly videotaped Congressman Kelly accepting $25,000 in 100- and 20-dollar bills from an undercover FBI agent at a Washington, D.C., townhouse.[7] The indictment followed.

The aspect of the Abscam investigation leading to this bribe began in 1979 when FBI agent Anthony Amoroso took on the undercover role of one Tony DeVito, president of the fictitious Abdul Enterprises. Mel Weinberg, a convicted confidence man working with the FBI, posed as the organization's financial adviser. Abdul Enterprises purported to represent two wealthy

Arab sheiks interested in investing in the United States. In the late summer of 1979, the pair told William Rosenberg, with whom they had had prior dealings, that the shieks would pay $25,000 for a member of Congress to introduce legislation allowing them to immigrate to the United States. Rosenberg[8] passed the word on to Stanley Weisz, an accountant. Weisz told Eugene Ciuzio, a business associate.

Kelly, a former Assistant U.S. Attorney and Florida Circuit Court judge, was in his third term in Congress when Ciuzio approached him in late November 1979 about helping with an unspecified immigration problem for an unnamed client of Ciuzio's. At the same meeting, the two discussed Kelly's debts. Kelly had first met Ciuzio in October 1979, and he thought Ciuzio, a self-described businessman who had promised to help Kelly earn speaking honorariums, was "a windbag or ... a crook." Tr. 2616. Nonetheless, Kelly agreed to help.

Ciuzio met the two principals, Weinberg and Amoroso, in Florida on December 19. Amoroso and Weinberg explained that Kelly would receive $25,000 as a down payment if he promised to introduce immigration legislation on behalf of one of the sheiks.[9] The next evening, Ciuzio telephoned Kelly in Washington. At Ciuzio's instructions, Kelly did not speak to Ciuzio from his home or office, but went to a pay telephone at a drugstore a few blocks from

4. The trial court dismissed the indictment against Kelly on due process grounds. 539 F.Supp. 363 (D.D.C.1982). This Court reversed and reinstated the conviction, leaving open the entrapment issue because it was not addressed in the trial court's ruling. 707 F.2d at 1468 n. 48, 1474–75.

5. After the jury convicted Congressman Kelly's codefendants, Eugene R. Ciuzio and Stanley Weisz, on the same counts, the trial court granted Ciuzio and Weisz a new trial. They were again found guilty, and their convictions were affirmed.

6. *See, e.g., United States v. Jenrette,* 744 F.2d 817 (D.C.Cir.1984); *United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983).

7. The videotape became government Exhibit 2–B at the trial. The transcript of the meeting was government Exhibit 2–C.

8. Rosenberg was later named as an unindicted coconspirator in the Kelly indictment.

9. At this meeting Ciuzio made representations about Kelly's willingness to take a bribe. During Ciuzio's testimony, the trial court cautioned the jury not to consider the conversations at the meeting as evidence against Kelly. Tr. 4255–56. Defense counsel emphasized this exclusion in final argument. Tr. 4666. Accordingly, in weighing the sufficiency of the evidence as to entrapment, we have disregarded that part of the record and of the government's brief. We grant Kelly's motion to strike that part of the government's brief.

his home in suburban Virginia and called back Ciuzio collect.

On December 23, Kelly and Ciuzio met at an Alexandria, Va., restaurant. According to Kelly's testimony at trial, Ciuzio told him about two Arabs with an immigration problem who were willing to pay a total of $500,000 for Kelly's assistance. Ciuzio promised that Kelly would receive $25,000 just for attending a meeting with representatives of the Arabs and would receive another $100,000 at the time of providing his official help to the sheiks. The rest of the money would go to Ciuzio, Weisz and Rosenberg. In addition, the Arabs would invest $15 million in central Florida, most of it in Kelly's congressional district, to provide a cover story to explain Kelly's legislative advocacy for them. Kelly testified that he told Ciuzio "I would be glad to" help with the immigration problem but would not accept any money. Tr. 2665–66. However, Kelly agreed to attend a meeting with the Arabs' representatives, and Kelly assumed that Ciuzio would receive money from the Arabs because Kelly cooperated. Tr. 2697. Kelly recalled telling Ciuzio, "I am glad to do this as a favor to you. If you want to do something for me ... I have got some real estate that I want to sell and perhaps you can help me find a buyer for that." Tr. 2666. Ciuzio set up the meeting for January 8, 1980.

On that day, Kelly flew from Florida to Washington for a speaking engagement and to attend the meeting arranged by Ciuzio. After meeting Ciuzio, Weisz and Rosenberg at the Madison Hotel,[10] Kelly went with them by chauffered limousine to the Arabs' townhouse on W Street in Georgetown. Kelly waited in the living room while Ciuzio went into the library with Weinberg.[11] The videotape [12] shows that Ciuzio tried to persuade Weinberg that the money should not be handed to Kelly.

Ciuzio: Don't hand him no fucking money, don't talk money, tell him what the problem is, how could ya help, he'll explain it ...

. . . . . .

Weinberg: Let Tony hand you the money in front of him. Long as we know he's getting the money ...
C: That's ok. But don't say hey, Congressman ... ya know what I mean? Ya can't make him a fucking hood, ya know.

. . . . .

W: Let him, let, just put the money on the table and say here, take it ... here Congressman, here's the twenty-five thousand, and that's it, you pick it up.
C: Go along with that, he knows the answers too.
W: All right, so ...
C: I rehearsed with him ...

Government Exhibit 2–C at 3, 10. Weinberg and Ciuzio left the library, and Amoroso and Kelly then met there alone.[13]

Amoroso (known to Kelly as Tony De-Vito) explained the proposal for Kelly to introduce immigration legislation on behalf of the two sheiks. The proposal was substantially the same as that made by Ciuzio, except that the second cash payment to be made upon introduction of the immigration bill was to be $75,000, not $100,000. Amoroso said he realized questions might be raised about why Kelly was acting on their behalf. Kelly immediately responded,

---

**10.** That was the first occasion Kelly met Weisz and Rosenberg. Kelly testified that he regarded both as dishonest and suspicious characters, but went with them to the townhouse anyway. Tr. 3070–72.

**11.** Kelly testified that he feared for his safety at the time and thought that "these people were dangerous." Tr. 2690. Nevertheless, he remained at the townhouse.

**12.** The jurors were shown the videotape of the meeting at the townhouse, Govt. Ex. 2–B, and had individual copies of the transcript, Govt. Ex.

2–C, to aid their understanding of what was said.

**13.** In evaluating the meeting that ensued between Kelly and Amoroso, the jury had the opportunity not only to observe the recollection of the participants on the witness stand, but to study the actual event as it was recorded on videotape, Govt. Ex. 2–B. They could appraise facial expressions, body gestures, tone of voice and other revealing aspects of demeanor not indicated in a bare transcript.

"I've got the reason." Ex. 2–C at 13. They agreed the reason would be investment by the Arabs in Kelly's district. Amoroso suggested the investment would take the form of a loan of $10 million to $15 million at favorable interest rates on a land development project designated by Kelly. Kelly responded, "All right, I've got the place." *Id.* at 15. After inquiring about interest rates, Kelly then asked, "Can I level with you?" *Id.* at 15. The following exchange occurred.

> Kelly: Ok. Here's here's what the thing is. All of this stuff that you've been talking about is umm ahh, I don't know anything about that, I'm not involved with it and it doesn't make any difference. Th ... the situation that ... that exists that's ahh some kind of business transaction you've got with somebody, but here's here's what the thing is, umm ahh Gino [Ciuzio] and these guys are my friend ...
>
> Amoroso: A hum.
>
> K: and ahh umm what you said makes a lot of sense to me ...
>
> A: Ok.
>
> K: ... and ahh, I'm gonna stick with ya ...
>
> A: Ok.
>
> K: ... and you can put me out there on the hill, and when you come back in the morning, I'll still be there.
>
> . . . . .
>
> K: So this thing this thing will ahh will be helpful to me and ahh umm maybe a ... a ... a down the road sometime, you can do me a favor. But in the meantime, whatever these guys are doing is is all right but I got no part in that.
>
> A: I don't ... now I don't I don't follow what you're saying, you got no part in ...
>
> K: In other words, in other words, your arrangement with these people is is all fine. But ahh I'm ahh ahh you have my assurance that what you have told me

here, sounds like a good thing and I'm ahh and I will I'll stick by these people. *Id.* at 16.

After Amoroso reiterated that he had thought Kelly, not Ciuzio, would take the money, Kelly asked to meet with Ciuzio. Kelly and Ciuzio then met alone.[14] When Kelly and Amoroso resumed their conversation alone in the library, the following exchange occurred.

> K: Here ... Listen, there's no, there's no problem. I understand the thing, and ahh ahh and I ahh I think that it's ahh, I think it's a very ahh a very good arrangement and I'm glad to be associated with you. Let's do it.
>
> . . . . .
>
> A: Ok. Well I was under the impression, ok, when, when this thing was set up, ok, that I was gonna give you something ta ... tonight ...
>
> K: Yeah.
>
> A: Ok, and that the rest was gonna come ...
>
> K: Yeah.
>
> A: ... when you introduce that.
>
> K: That's right.
>
> A: Ok, is that is that sti...
>
> K: Yeah. Here's here's what, here's what the thing is. Umm ahh just simply deal with Gino about it.
>
> A: Ok. You want me to give him the money huh here?
>
> K: Sure.

*Id.* at 22–23. Amoroso agreed to do that, but said it made it seem "you kinda didn't trust me." *Id.* at 23. Kelly then explained that "what kind of arrangements you got with him, it's ... it's ... it isn't gonna make any difference to you, it makes some difference to me, ok?" *Id.* at 24. Kelly reassured Amoroso he would perform the services requested by the Arabs.

> K: and and I'm gonna do it just exactly. Now, but here's ahh but here's what the situation is. Umm ahh I am so damn poor you couldn't believe it. I mean if I told you how poor I am, you'd cry. I

---

**14.** The conversation was not recorded since neither participant consented.

mean the tears would roll down your ... eyes ...

*Id.* Amoroso then told Kelly that Ciuzio and the other intermediaries, Rosenberg and Weisz, would be taken care of separately. Kelly said, "It's a very complicated thing ahh to ahh for me ta start dealing in money." *Id.* at 26. Amoroso responded that that was why he was meeting privately with Kelly.

A: ... and I thought that the best way of doing it was was a one on one between you and I. Now to me that sounds like it was the ... if you're looking for security, I ... I thought that was the best way of doing it.

K: I think so too.

A: Ok ... Then based on that premise, I have it here ... that that what I'm tellin ya [sound of drawer being pulled open] ... I I put this ... I'm not, ya know like I said, I just put the money here.

K: How much is that?

A: Twenty-five thousand dollars ... That's why I told him, I says I thought it'd be easier if I gave it to you myself ... Ya know, to me that sounded th ... the best way of doing it and just between you and I ...

K: I agree.

*Id.* at 27–28. Amoroso said, "It's up to you." *Id.* Kelly then picked up the money from the table and began stuffing it in various pockets of his suit jacket and pants while he told Amoroso of a real estate development owned by a friend of his that the Arabs might want to invest in to help Kelly's friend escape an onerous loan. The two then exchanged telephone numbers, with Kelly giving four numbers in Washington and Florida. Amoroso said he wanted to make sure "you're gonna do it now." *Id.* at 35. Kelly responded:

K: No problem.

A: ... you you will introduce legislation?

K: We'll do whatever, whatever, we'll g ... go the route to get it done.

A: Ok.

K: Whatever that takes.

. . . . .

A: Ok.

K: ... but you need to do what ya gotta do.

A: Ok, if that includes the introduction of the legislation, that's I I that's what we'll do.

K: It includes ... e ... e ... everything includes everything.

*Id.* at 35. Kelly took the money home, left it in his car's glove compartment overnight, and took it with him to Florida the next day. He spent part of it during the next few weeks. When the Abscam operation was made public on February 2, 1980, Kelly flew to Washington and turned over the money to the FBI.

At his trial, Kelly testified at length that he played along with Ciuzio's proposal to attend the meeting because he was investigating his suspicions that one of his trusted staff members was trying to corrupt him. He told the jury he wanted not money but answers to his questions. Asked why he did not simply walk out of the meeting with Amoroso, Kelly testified:

Well, if I was going to practice my righteous indignation, I would never have gone to the house on W Street. I went there to try and get some sort of a solution and information, and by me jumping out and walking out of there, I don't think I was going to get it. I felt as though that I had to just hang in there and see what happened.

Tr. 2709.

He eventually took the money, he said, because

If I was going to go forward with what I was doing [his investigation], I had no alternative but to take the money. And I knew that what I was dealing with didn't involve immigration. I felt as though I had to find out and I was in the best position to find out, and that the responsibility to find out was mine. And so I went forward.

Tr. 2713.

On cross-examination Kelly conceded Amoroso had given him the option of whether to take the money.

Yes. He did after I had refused it 15 times. He said he wasn't going to trust me unless I took the money. And I clearly had the option of just simply backing out of there or taking the money. And I believed the thing for me to do was to take the money, and I did it.

Q. You decided to take the money; correct?

A: I did. And it was free will. I did that.

Tr. 3078.

■ The trial court accurately and without objection instructed the jury on the defense of entrapment.

> Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, that person is a victim of entrapment, and as a matter of public policy, the law forbids his conviction in such a case. On the other hand, where a person is predisposed to commit an offense ... that is, ready and willing to violate the law at the first opportunity, the fact that these government officials or their agents afford him the opportunities to do so does not constitute entrapment.

Tr. 4930. The court went on to define the two key elements of inducement and predisposition and to instruct the jury that it could acquit on this defense only if it found that Kelly had indeed committed the crimes, that he had been induced to do so, and finally that a reasonable doubt existed as to whether he was predisposed. Tr. 4931–33. We approved such entrapment instructions in *United States v. Burkley,* 591 F.2d 903, 913–16 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979).[15]

The court thus put to the jury two interlocked issues: did the government's behavior go beyond merely offering Kelly the opportunity to break the law, and if it did, was he so predisposed to commit the crime that his predisposition rather than the government's action caused the crime. The jury found Kelly guilty on all counts without a special verdict on these issues, so we cannot know whether the jurors found predisposition or merely no governmental inducement.

## II. ANALYSIS

Kelly raises three issues on appeal. First, he contends he should have a new trial on the ground that the jury should have been instructed only to consider whether he was predisposed to commit the crimes, not additionally whether he was induced to commit the crimes, because he had presented sufficient evidence that he had been induced to commit the crimes. In short, he urges that inducement, the other part of the two-part entrapment test, had been established as a matter of law and should not have been submitted to the jury. Second, he contends the district court should have acquitted him on the ground that the evidence refuted predisposition and established entrapment as a matter of law. Third, he contends the weight of the evidence is at least sufficiently contrary to the verdict that he should be granted a new trial in the interest of justice.

### A. *Entrapment*

■ We must first consider whether the trial court should have removed the issue of inducement from the jury, allowing the jurors only to consider his predisposition. Inducement focuses on whether the government's conduct could have caused an undisposed person to commit a crime. *See United States v. Jenrette,* 744 F.2d 817,

---

15. As the Supreme Court noted in its most recent decision on the issue, entrapment

> is a relatively limited defense ... rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "overzealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government.

*United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). The ultimate issue of the entrapment defense is "the defendant's predisposition to commit the crime." *Id.* at 433, 93 S.Ct. at 1643.

822 n. 7 (D.C.Cir.1984). It is thus an objective inquiry measuring whether the government's behavior was such that a law-abiding citizen's will to obey the law could have been overborne. If a defendant convinces the jury "that there is *some* evidence of government inducement," *Burkley*, 591 F.2d at 914 (emphasis in original), the burden then shifts to the prosecution to prove the defendant's predisposition beyond a reasonable doubt. *Id.* At that stage, the focus shifts to a subjective inquiry about the particular defendant's state of mind.

The trial court properly defined inducement for the jury in words taken almost verbatim from the jury instruction on inducement that we approved in *Burkley*, 591 F.2d at 913 & n. 18.[16] There was no objection to these instructions. Kelly now continues to press only the objection he raised before the case was submitted to the jury: that the undisputed evidence, even with all inferences drawn in favor of the government, indicates to any reasonable mind that there was "some evidence" of inducement. We disagree.

■ Kelly contends that the nature of the promises made to him and the manner in which they were made proves "some evidence" of inducement. Specifically, he points among other things to the fact that he was promised $25,000 for initially doing no more than attending a meeting with the Arab representatives, that he was promised an additional $75,000 upon introducing a

bill in Congress, that he was offered the chance to designate a third-party recipient of a multi-million dollar loan at low interest, that Amoroso made these blandishments repeatedly, and that eventually the cash was laid out in front of him. The government argues that its behavior amounted to no more than offering Kelly a single opportunity to commit a crime. Reasonable persons could differ as to whether the amount of money offered Kelly and the manner in which the offer unfolded went beyond merely offering Kelly an opportunity to commit a crime.[17] The question of how a reasonable person would have reacted is a quintessential jury issue, and the evidence here is not so unequivocal to mandate one conclusion or another. Although the trial court had a personal view that there was some evidence of inducement, Tr. at 1893, 4382, it was scrupulously correct in deciding that a reasonable juror could come to a different conclusion, and it correctly refused to find inducement as a matter of law.

Moreover, we are persuaded there is ample evidence, much of it out of Kelly's own mouth, to support a finding beyond a reasonable doubt that he was predisposed to commit the three crimes of which he was convicted.

■ Predisposition is a "state of mind which readily responds to the opportunity furnished by the officer or his agent to commit the forbidden act for which the

16. That instruction provides:

Inducement by law enforcement officials may take many forms including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship. A solicitation, request or approach by law enforcement officials to engage in criminal activity, standing alone, is not an inducement. Law enforcement officials are not precluded from utilizing artifice, stealth and strat[a]gem, such as the use of decoys and undercover agents, in order to apprehend persons engaged in criminal activities, provided that they merely afford opportunities or facilities for the commission of the offense by one predisposed or ready to commit it. They may properly make use of undercover operations, in which they assume false names and false appearances. They may properly assume the

roles of members of criminal organizations. They may properly offer or give to the defendant the money which is involved in the commission of the crime itself. And they may properly instigate the offer of money to the defendant.

17. Although Kelly concedes the evidence at this review should be viewed with inferences drawn in the government's favor, his argument repeatedly does the contrary. For example, his contention that he was offered the cash seven times and the loan 14 times before he succumbed is only one interpretation, and a strained one at that, of what the videotape showed. The jury could reasonably have found instead that there was only a single offer of money that Kelly and Amoroso then discussed in a rambling and repetitious fashion.

accused is charged." *United States v. Burkley*, 591 F.2d at 916 (quoting *Hansford v. United States*, 303 F.2d 219, 222 (D.C.Cir.1962)). Put another way, a predisposed defendant is "presently *ready and willing* to commit the crime." *Burkley*, 591 F.2d at 916 (emphasis in original).

■ The prosecution was required to prove predisposition for each offense charged. For the interstate travel offense, 18 U.S.C. § 1952, it was required to show Kelly was predisposed to commit bribery at the time he flew to Washington the day of the January 8 meeting. For the conspiracy count, it had to show predisposition in the overt acts Kelly allegedly committed in furtherance of the conspiracy. Those were the same January 8 trip to Washington, the attendance at the meeting and the acceptance of the money. Predisposition for those counts and for the bribery count itself thus boils down to the question of whether Kelly was predisposed to commit bribery on January 8.

Kelly argues that the only relevant question is his state of mind on December 23, the date when he contends Ciuzio first told him of the corrupt nature of the immigration assistance he was seeking. He contends his lack of predisposition was proven as a matter of law by his rejection of the offer of money on that date.

■ First, the evidence of Kelly's rejection is highly equivocal. The jury reasonably could have concluded that by Kelly's own account, he agreed at the December 23 meeting to attend the January 8 meeting, agreed to be influenced in return

for Ciuzio's help in selling real estate for Kelly, and understood that Ciuzio might receive money from the Arabs for Kelly's immigration aid. The caveat that he did not want money himself [18] did not change the corrupt nature of Kelly's agreement.[19] Moreover, Kelly admitted he had called Ciuzio from a telephone booth a few days before December 23 to avoid eavesdropping. That is hardly a standard practice for the "unwary innocent" whom the law of entrapment seeks to protect. *See Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958). Subsequent events shedding light on his predisposition as of December 23 also refute his contention that there was uncontradicted evidence that he was not predisposed to commit the crimes on December 23. *Cf. United States v. Gallo*, 543 F.2d 361, 365 (D.C.Cir.1976) (subsequent acts can be probative of a prior state of mind).

Second, even if Kelly showed no predisposition on December 23, it is simply not the law that predisposition is to be determined based solely on the defendant's reaction to his first encounter with the corrupt offer. If that were so, bribe-takers could immunize themselves from prosecution by the artifice of always vigorously refusing the initial offer. Rather, predisposition is to be determined, like any state of mind issue, from the entirety of the events surrounding the ultimate commission of the crime. *See United States v. Brown*, 567 F.2d 119, 120 (D.C.Cir.1977).[20] An initial expression of reluctance or a refusal to participate in an illegal scheme is of course

---

**18.** This assumes, of course, that one believes Kelly's account of the meeting. The jury obviously was entitled, based on the other evidence that Kelly was interested in financial advantage for himself, to find him without credibility. There was certainly ample basis for the jury to disbelieve anything Kelly said.

**19.** It is bribery whether a public official accepts something of value for himself or "for any other person or entity" in return for his being influenced. 18 U.S.C. § 201(c). The indictment charged that Kelly "did corruptly seek, accept, receive, and agree to receive a sum of money and other things of value for himself *and for other persons ...*" (emphasis added).

**20.** Kelly quotes out of context language from *United States v. Brown* that "[t]he question is whether the events are relevant to and probative of defendant's willingness to commit the crime charged when *first* solicited to do so by a government agent." *Id.* at 120 (emphasis added). We were referring in that case to the use of subsequent events to prove a defendant's state of mind at a prior time when he agreed to the agent's solicitation, in other words, to show his predisposition at the time he committed the crime. We intimated no special rule that predisposition is to be determined only as of the time of an initial solicitation.

relevant, *see United States v. Borum*, 584 F.2d 424, 429 (D.C.Cir.1978), but it is not the only consideration.

 The evidence of Kelly's predisposition is copious. The videotape of the January 8 meeting contradicts Kelly's portrait of repeated and insistent government importunings wearing down his reluctance. The evidence of his reluctance is largely vaporous. From the outset, Kelly showed not the slightest surprise at the initial bribe offer. He registered no shock. He made no protest. Asked if he knew the cover story for his aid to the Arabs, he responded without hesitation, "I've got the reason." Asked if he had in mind where the Arabs could make loans in Kelly's district, he was equally quick to say "I've got the place."

Contrary to his account at trial, and contrary to his repeated assertion in his briefs, Kelly never once at the townhouse meeting rejected his participation in the bribe scheme, much less 15 times as he told the jury from the witness stand. Kelly coolly puffed on a cigar through much of the meeting, and he repeatedly assured the FBI agent that he would do the bidding of the Arabs. He showed evasiveness and reluctance only at the prospect of physically taking the money directly with his own hands. He showed knowledge and acquiescence that even if he did not take money himself, his "friends" Ciuzio and Weisz[21] would benefit, and that he also expected to benefit later. When the agent assured Kelly that their meeting was private between the two of them, Kelly calmly picked up the money and stuffed it in his pockets as he began telling the agent of a friend to whom he hoped the Arabs could make a multi-million dollar loan at low interest.[22]

On this evidence alone, a reasonable jury could only find that Kelly knew what he was getting into when he went to the meeting at the townhouse and that he readily responded to the opportunity presented there. But what is more, Kelly contradicted his own entrapment argument in his testimony.

Kelly told the jury an elaborate—and ultimately bizarre and preposterous—story that he was conducting his own investigation of attempts to corrupt him. He believed these efforts originated from a trusted member of his own staff, yet he never fired this person and continued to give the person important duties. Despite his experience in investigative techniques as a prosecutor and a judge, he never made any independent efforts to find out anything about this alleged plot or to enlist the help of law enforcement officials. He took no notes. He saved no clues.[23] He told no one of his suspicions. By his own testimony, his so-called investigation consisted entirely of playing along with the obvious efforts to corrupt him to find out where they would lead. The jury could well have concluded this was the desperate defense of a Congressman caught red-handed, and

---

**21.** Kelly testified he had only met Ciuzio a handful of times before the January 8 meeting and that he had not met Weisz until that evening.

**22.** We do not mean, of course, that the actual taking of the money refutes his entrapment defense. The manner in which it was taken and the defendant's demeanor at the time, however, are evidence probative of his state of mind.

**23.** Kelly explained at trial that
... I studiously avoided any kind of records on any occasion with regard to anything, because I felt as though if I were discovered with any kind of records, I could be as dead as a mackerel....
Q: You were investigating these people, correct?
A: Yes.

Q: With eyes toward exposing them at some time, right?
A: Yes.
Q. And you didn't think it important to make any records of what you were doing?
A: No. I thought it was important that I not make any records because the nature of the investigation that I was undertaking was not to get fingerprints and identification and tire tracks and that kind of evidence. What I was attempting to do was to find out what was the purpose of what appeared to me to be an extensive highly-financed and highly-organized criminal operation that was going to do something that would involve a member of the United States Congress, to wit, me.
Tr. 2912.

the jury could have disbelieved all of his testimony accordingly.

■ Consistent with his story, Kelly did not testify that his will was overborne by any insistent importunings.[24] Instead, he admitted that he took the money out of "free will," as the videotape clearly demonstrates, but did so with a lack of criminal intent. The jury was entitled to reach the most obvious conclusion: Kelly attended the January 8 meeting and took the money because he was predisposed to be bribed.

## B. *Weight of the Evidence*

Kelly's final argument is that the district court abused its discretion in declining to order a new trial on the ground that the verdict was against the weight of the evidence and that a new trial was required in the interest of justice. He concedes that the district court has wide discretion in ruling on such a motion, subject to reversal only if it is a clear abuse of discretion. *See United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980).

■ Kelly's sole ground for pressing this claim is that the trial court abdicated its function by finding that the evidence weighed in Kelly's favor but then remarking, "I can't do anything about it." Transcript of Jan. 12, 1984 motion hearing at 63. Kelly's argument seriously distorts the trial court's remarks. It is apparent that the trial judge believed in his own mind that Kelly probably had been entrapped but recognized that a jury could disagree and that the choice was the jury's to make. Because the weight of the evidence clearly weighs in favor of conviction, not against it, we cannot say that the trial court abused its discretion in refusing a new trial.

**24.** Kelly, of course, had no obligation to testify in his own behalf. Nor was he precluded from arguing defense theories that a jury might conclude were inconsistent. *See Hansford v. United States,* 303 F.2d 219, 221 (D.C.Cir.1962). *Cf. United States v. Shameia,* 464 F.2d 629, 630 (6th Cir.1972) (collecting cases from other circuits

### III. CONCLUSION

Accordingly, the district court's denial of the motions for judgment of acquittal and for new trial was proper, and the conviction is affirmed on all counts.

*Affirmed.*

where defendants not allowed to raise defense of entrapment if they also deny committing the underlying acts constituting the crime). But when he chose to give testimony at odds with the entrapment defense, he ran the risk of undercutting his own case.