United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 4, 1997 Decided September 4, 1998 

 No. 96-3130

 United States of America, 

 Appellee

 v.

 Fred M. Glover, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 96cr00011-01)

 Antoini M. Jones argued the cause for appellant, with 
whom Joseph L. Gibson, Jr. was on the brief.

 Helen M. Bollwerk, Assistant U.S. Attorney, argued the 
cause for appellee, with whom Mary Lou Leary, U.S. Attor-
ney, John R. Fisher, Thomas C. Black, and Richard L. 
Edwards, Assistant U.S. Attorneys, were on the brief.


 Before: Silberman, Williams and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Garland.

 Garland, Circuit Judge: Defendant Fred Glover was con-
victed and sentenced on multiple charges of distributing crack 
cocaine, and of doing so within 1000 feet of a school. Glover 
claimed at trial that he was merely "play-acting" when he sold 
crack to a government informant. But he also argued in the 
alternative that, even if he were guilty of distributing crack, 
he was "entrapped" by the government into committing the 
crime. His principal claim on appeal is that the district court 
erred by failing to give the jury an instruction on his entrap-
ment defense. Glover also contends that: there was insuffi-
cient evidence for a jury to conclude he distributed drugs 
within 1000 feet of a school; he was the victim of sentencing 
entrapment because the government informant caused the 
drug transactions to occur within 1000 feet of a school; his 
sentencing pursuant to a statute that classified his prior 
offenses as felonies violated the Ex Post Facto Clause of the 
Constitution; and his counsel provided ineffective assistance 
at trial. For the reasons set forth below, we reject each of 
these contentions and affirm the judgment of the district 
court.1

 I

 In August 1995, Glover was operating a restaurant on 
Ninth Street, N.W. in Washington, D.C. Stepney Jones came 
to see Glover at the restaurant. Jones and Glover had played 
basketball together in the neighborhood in the early 1970s, 
but they did not know each other well and had not seen each 
other in years. Glover knew that Jones operated a conve-
nience store in northwest Washington, called "the Corner 
Store." What Glover did not know was that Jones was 
working as an informant for the Metropolitan Police Depart-
ment (MPD) and the Drug Enforcement Agency (DEA).

__________
 1 Glover raises a number of additional contentions as well. We 
have considered each of them, but reject them as too meritless for 
further discussion.

 Claiming that he had recently won some money in the 
lottery, Jones asked Glover whether he could "get a buy off 
him." Trial Transcript ("Tr.") at 189. Glover told Jones to 
"get back with him" and gave Jones his pager number and an 
identification code to use when paging him. Id. at 189, 200. 
Jones tried paging Glover with the code several times, but 
Glover did not initially return the pages.

 On August 22, 1995, Jones succeeded in reaching Glover, 
and asked whether he could purchase cocaine from him. In 
another phone call later that day, Glover asked whether 
Jones wanted it "hard or soft," referring to the distinction 
between crack and powder cocaine. Glover stopped by Jones' 
convenience store later that day to confirm what Jones want-
ed. The following day, August 23, Glover telephoned Jones 
and then came to his store. In the store's basement, in a 
transaction recorded on videotape, Glover gave Jones 27.68 
grams of crack in exchange for $800 provided to Jones by the 
DEA.

 On September 12, 1995, Jones again telephoned Glover and 
requested drugs. Later that afternoon, Glover came to the 
store, went to the basement, and sold Jones 58.66 grams of 
crack for $1600. The DEA again provided the money Jones 
used and videotaped the transaction.

 Finally, on December 20, 1995, Jones had additional tele-
phone conversations with Glover in which he said he wanted 
to purchase more crack. On December 21, 1995, Glover 
arrived at Jones' store, gave Jones 58.15 grams of crack at 
the top of the stairs leading to the basement, and received 
$1500 in DEA funds when they reached the basement. Id. at 
237-40. The portion of the transaction that occurred in the 
basement was again videotaped. Upon leaving Jones' store, 
the police arrested Glover and seized the DEA money from 
him.

 At trial, Glover conceded that he had participated in each of 
the videotaped transactions, but testified that he had done so 
only as a form of "play-acting." Glover said Jones told him 
he needed money and that he had a "cousin in Detroit" he 
wanted to impress with his involvement in the drug trade. 


Id. at 365-66. Glover testified that he agreed to participate 
in what he believed to be sham drug transactions in order to 
"impress" Jones' cousin from Detroit. He said Jones always 
gave him the substance to be exchanged in advance, but 
outside of the video camera's range. Glover said he did not 
know what the substance was, but that on one occasion Jones 
told him it was soap. Glover also said that he always 
returned the money to Jones after leaving the basement--
with the exception of the final transaction, when the money 
was found on his person. Glover said he did not know the 
transactions were being videotaped, but said he believed 
Jones' cousin was watching them through a crack in the 
basement wall.

 In addition to asserting the "play-acting" defense, Glover 
also requested that the district court give the jury an entrap-
ment instruction, arguing that he was entitled to such an 
instruction based on his testimony that Jones induced him to 
participate in the charged conduct. The trial judge denied 
the request, relying at first on the ground that Glover had not 
acknowledged that he committed the crime. Id. at 454. 
Later, after reviewing this court's decision in United States v. 
McKinley, 70 F.3d 1307 (D.C. Cir. 1995), the judge rested his 
denial on the ground that "the factual predicate that would 
trigger the requirement that such an instruction be given is 
not present in this case." Tr. at 457. The jury subsequently 
convicted Glover on all charges and this appeal followed.

 II

 We review the district court's decision to deny Glover's 
request for an entrapment instruction de novo. United 
States v. Layeni, 90 F.3d 514, 517 (D.C. Cir. 1996). In so 
doing, we must take Glover's "version of the facts as true." 
McKinley, 70 F.3d at 1310; see United States v. Borum, 584 
F.2d 424, 427 (D.C. Cir. 1978). But which version? That he 
was play-acting? That he never kept any money (except the 
money the government found on him) and never intended to 
distribute drugs? Or that he did keep the money and did 


intend to distribute drugs, but that that intent was formed as 
the result of government inducement?

 In its first decision, the district court essentially assumed 
the truth of the play-acting version to which Glover testified. 
It therefore concluded that since Glover said he had not 
intended to distribute drugs, he could not have been wrong-
fully induced by the government into so doing. That was a 
reasonable conclusion. Indeed, it could be said that to have 
taken the other view would have permitted Glover's attorney 
to argue to the jury as follows: Even if you believe my client 
lied to you on the stand when he said he was play-acting, you 
should still find him not guilty if the government wrongfully 
induced his drug dealing. And "there is respectable authori-
ty for concluding that no legitimate end of the criminal justice 
system is served by requiring a trial court to entertain such 
tactics, in the form of an entrapment defense which is at odds 
with the defendant's own testimony." Mathews v. United 
States, 485 U.S. 58, 71 (1988) (White, J., dissenting).

 Respectable as such authority is, however, it was the 
dissenting rather than majority view in Mathews v. United 
States. In that case, the Supreme Court began with the 
premise that defendants are permitted to raise inconsistent 
defenses, even, the Court said, as inconsistent as arguing in a 
rape case "that the act did not take place and that the victim 
consented." Id. at 64 (citing Johnson v. United States, 426 
F.2d 651, 656 (D.C. Cir. 1970)). It then concluded that, since 
inconsistent defenses are permitted, and since "a defendant is 
entitled to an instruction as to any recognized defense for 
which there exists" sufficient evidence, 485 U.S. at 63, it 
followed that "even if the defendant denies one or more 
elements of the crime, he is entitled to an entrapment instruc-
tion whenever there is sufficient evidence from which a 
reasonable jury could find entrapment," id. at 62.

 It could be said that the defendant did not really present 
inconsistent positions in Mathews. There, the defendant was 
a Small Business Administration employee who accepted 
loans from a government contractor who, unbeknownst to 
him, was cooperating with law enforcement. The government 


charged that the loans were a gratuity in exchange for an 
official act. Mathews contended they were personal loans 
unrelated to any official action. He also contended that the 
cooperator induced him to accept the loans. If that were all 
Mathews had argued, the two contentions would not necessar-
ily have constituted inconsistent defenses. Rather, they could 
be regarded as two elements of a single defense of lack of 
criminal intent: He did not accept the loans in exchange for 
an official act; instead, the government had tricked him into 
accepting loans that he thought were unrelated to his work.2 
The same would be true here if Glover had argued only that 
the government had tricked him into distributing what he 
thought was soap.

 But that was not all that either Mathews or Glover con-
tended. Mathews wanted both to testify that he had no 
intent to commit a crime, and to have the jury instructed that 
even if he did have such an intent (i.e., to take the loan in 
exchange for an official act), it should still find him not guilty 
if it found the government had entrapped him. Id. at 65. 
Similarly, Glover wanted an instruction that even if the jury 
found he did intend to distribute crack (rather than soap), it 
should still acquit if it found the government had wrongfully 
induced him. Assuming there were sufficient evidence of 
entrapment, the Supreme Court held that Mathews was 
entitled to such an instruction. The same must be true for 
Glover.

 Moreover, the necessary corollary of Mathews is that the 
version of the facts we must take as true for purposes of 
analyzing the validity of Glover's entrapment defense is the 
one that supports that defense ("I did it, but I was en-
trapped"), and not his alternative claim of innocence ("I did it, 
but I was play-acting."). That means, for example, that we 
must assume Glover kept the money he was seen to take on 
the videotape, and that he knew the substance he gave Jones 
was crack rather than soap. Otherwise, there would be no 

__________
 2 Mathews testified that the contractor told him that he (the 
contractor) was hiding the money from his wife, and needed to get 
rid of it quickly by loaning it to Mathews. See Mathews, 485 U.S. 
at 61.

evidence of inducement, and no crime into which the defen-
dant had been induced. And that would effectively deprive 
the defendant of his right, under Mathews, to assert inconsis-
tent defenses.

 The government does not dispute these conclusions drawn 
from Mathews, and does not support the district court's 
denial of an entrapment instruction on the ground that Glover 
refused to concede his intent. See Gov't Br. at 15 n.16. 
Instead, the government argues that Glover has not estab-
lished that "there is sufficient evidence from which a reason-
able jury could find entrapment." Mathews, 485 U.S. at 886. 
And it interprets the trial court as ultimately relying on that 
ground in refusing to give an entrapment instruction--i.e., on 
the ground that "the factual predicate that would trigger the 
requirement that such an instruction be given is not present 
in this case." Tr. at 457. We interpret the district court's 
refusal the same way, and agree with both the district court 
and the government that Glover did not establish the prereq-
uisites for an entrapment instruction.

 The entrapment defense "has two related elements: gov-
ernment inducement of the crime, and a lack of predisposition 
on the part of the defendant to engage in the criminal 
conduct." Mathews, 485 U.S. at 63. In this circuit, the 
defendant bears the initial burden of showing government 
inducement; if he is successful, the burden then shifts to the 
government to prove the defendant was predisposed to com-
mit the crime. See McKinley, 70 F.3d at 1312; United States 
v. Budd, 23 F.3d 442, 445 (D.C. Cir. 1994); United States v. 
Whoie, 925 F.2d 1481, 1484 (D.C. Cir. 1991). Both induce-
ment and predisposition are normally matters for the jury. 
See McKinley, 70 F.3d at 1312; Budd, 23 F.3d at 445; Whoie, 
925 F.2d at 1483. "However, a defendant only 'is entitled to 
an entrapment instruction when[ ] there is sufficient evidence 
from which a reasonable jury could find entrapment.' " 
McKinley, 70 F.3d at 1309 (quoting Mathews, 485 U.S. at 62); 
see United States v. Burkley, 591 F.2d 903, 914 (D.C. Cir. 
1978).

 The government's behavior amounts to inducement when it 
was "such that a law-abiding citizen's will to obey the law 


could have been overborne." United States v. Kelly, 748 F.2d 
691, 698 (D.C. Cir. 1984); see McKinley, 70 F.3d at 1313. 
Glover argues that he satisfied the inducement predicate 
because Jones repeatedly asked him to provide drugs.3 We 
have held, however, that even repeated government solicita-
tions do not establish inducement "unless the requests are 
coupled with persuasive overtures, or unless there is evidence 
of reluctance on the defendant's part demonstrating that the 
repetition of the requests may have moved an otherwise 
unwilling person to commit a criminal act." McKinley, 70 
F.3d at 1312 (internal quotations and citations omitted).

 Taking the second caveat first, Glover's best evidence of 
"reluctance" is his testimony that he initially avoided Jones' 
pages because he did not want to provide him with narcotics. 
Glover only responded, he claims, when Jones entered a 
phony code into the pager. But even accepting this testimo-
ny, it is insufficient evidence of reluctance. As soon as Jones 
did reach him, Glover made clear he was willing to deal. 
That same day, Glover called Jones back to confirm whether 
he wanted it "hard or soft," and the very next day Glover 
delivered the crack to Jones' store--on videotape. This 
ready willingness to supply drugs once Jones contacted him 
belies Glover's claim that his will was overborne by incessant 
government overtures. To the contrary, it suggests the kind 
of "acquiesce[nce] with reasonable readiness" we found insuf-
ficient to show inducement in McKinley. 70 F.3d at 1312.

 Nor is there evidence of any "persuasive overtures" that go 
beyond those ordinarily present in a drug transaction. Even 
if we disregard Glover's testimony that he never took any 
money from Jones--as Mathews indicates we must--such 

__________
 3 Because we are concerned here with the evidence that sup-
ports Glover's entrapment claim--i.e., that the government induced 
him to form the intent to distribute crack--we consider only the 
alleged inducement to engage in a drug transaction. As suggested 
above, inducement to "play act" alone would not justify an entrap-
ment instruction, although it would be relevant to defendant's 
alternative defense that he never intended to do anything more 
than play-act.

payments are "the typical benefit of participating in this type 
of criminal enterprise." And that is a "form of reward that is 
not sufficient, by itself, to establish inducement." Id. at 1314; 
see United States v. Evans, 924 F.2d 714, 717 (7th Cir. 1991).

 Glover also claims that at one point Jones tried to further 
induce him by offering to trade Glover's crack for heroin from 
Jones' "cousin" at an unusually advantageous rate. Glover 
Br. at 32. Even if such a trade went well beyond the "typical 
benefit" for this type of conduct, Glover's own testimony was 
that this offer was not made until the first two crack transac-
tions had already been completed. Tr. at 374-75. Hence, it 
could not have been an inducement for those transactions. 
See McKinley, 70 F.3d at 1313-14. Nor did Glover testify 
that he would not have completed the remaining crack deal 
were it not for the heroin offer. See id. at 1313. Indeed, 
since Glover testified that he declined the heroin offer, and 
since no evidence was offered to the contrary, it does not 
appear to have amounted to much of an inducement for 
anything.

 Finally, Glover contends that Jones played off his "friend-
ship" in order to convince him to provide the drugs in 
question. But even Glover concedes the evidence shows he 
had not seen Jones in years, did not know him well, and that 
"they were not close friends." Glover Br. at 3, 17; Tr. at 357, 
360. An appeal to that kind of friendship is hardly sufficient 
to overbear the will of a law-abiding citizen. If it were, the 
government would never be able to use an informant who had 
virtually any kind of preexisting relationship with a defen-
dant.

 In short, Glover produced no evidence of inducement be-
yond the ordinary opportunity to commit a crime and profit 
thereby. That kind of evidence does not warrant an entrap-
ment instruction, and the district court properly refused to 
give one.

 III

 Glover also argues that there was insufficient evidence for 
the jury to conclude he distributed cocaine within 1000 feet of 
a school, in violation of 21 U.S.C. s 860(a), commonly known 

as the "schoolyard statute." While sufficiency of the evidence 
claims are reviewed de novo, our role is still limited. We 
must "allow[ ] the government the benefit of all reasonable 
inferences that may be drawn from the evidence, and per-
mit[ ] the jury to determine the weight and credibility of the 
evidence." United States v. Sutton, 801 F.2d 1346, 1358 (D.C. 
Cir. 1986). And we must affirm the conviction if any reason-
able juror could have found the elements of the offense 
beyond a reasonable doubt. See Jackson v. Virginia, 443 
U.S. 307, 319 (1979).

 At trial, the government offered uncontested testimony 
that the distance between Jones' store--where each of the 
three drug transactions took place--and Banneker High 
School was 674 feet. Tr. 315-16. Glover asserts this testimo-
ny was insufficient for two reasons. First, he claims that the 
jury could not properly infer that Banneker High School "was 
in fact in existence at the time of the alleged transactions" or 
that it was "in fact at the same location at the time of the 
alleged transactions." Glover Br. at 36. We disagree. Ban-
neker High School is a well-known institution in the District 
of Columbia. A police officer testified that he had been to the 
school and had measured the distance between the school and 
the convenience store. A diagram indicating the location of 
"Banneker Senior High School" and Jones' store was intro-
duced into evidence. Glover did not suggest, by cross-
examination or otherwise, that Banneker was not in existence 
or at the same location at the relevant time.4 Under these 
circumstances, the jury could reasonably infer that the un-
stated premise of the testimony and diagram was that both 
were accurate as of the dates at issue, and that Banneker 
High School had not been built in the nine months between 
the first drug transaction and defendant's trial. See United 
States v. Brookins, 919 F.2d 281, 283-84 (5th Cir.1990).5

__________
 4 And for good reason: even defendant's appellate counsel 
concedes he "is of the belief that Banneker Senior High School has 
been in the same location for over forty-five years." Glover Br. at 
37 n.3.

 5 For the same reason, we reject Glover's contention that, 
without express testimony, the jury could not infer that the "cali-

 Second, Glover claims that the 674-foot measurement the 
government offered at trial was insufficient to establish that 
the drug transactions took place within 1000 feet of a school, 
because it measured only the distance between the school and 
the front door of the store, and did not include the distance 
from the front door to the basement where the drug transac-
tions actually took place. In support, Glover cites United 
States v. Applewhite, 72 F.3d 140 (D.C. Cir. 1995), and United 
States v. Johnson, 46 F.3d 1166 (D.C. Cir. 1995), cases in 
which we held that measurements to points short of the 
actual locations of the drug transactions were insufficient to 
sustain convictions under the schoolyard statute.

 Applewhite and Johnson do not carry the day for Glover. 
In each of those cases, the distance from the school to the 
property line of the location at which the drug deal took place 
was itself well over 900 feet. See Applewhite, 72 F.3d at 143-
44 (distance from school to entrance of multi-unit apartment 
building was 920.2 feet); Johnson, 46 F.3d at 1169-70 (dis-
tance from school "to a point five feet up the walkway to 
Johnson's house" was 994 feet). In those cases, we concluded 
that the jury could not reasonably infer that if the remaining, 
unmeasured distance were added, the total would still be less 
than 1000 feet. The leeway for error was simply too small.

 In this case, by contrast, after taking account of the 
distance between the school and the store's front door, the 
government still had 326 feet to spare. Hence, unless the 
distance between the convenience store's front door and its 
basement was more than the length of a football field, the 
drug transactions took place within the prohibited 1000 feet. 
A reasonable juror, using ordinary common sense, could 
conclude that a convenience store in a residential neighbor-
hood is extremely unlikely to be larger than a football field. 
See United States v. Harrison, 101 F.3d 984, 990 (D.C. Cir. 
1997) (where distance from school to building entrance was 
472 feet, jury could reasonably conclude that additional dis-
tance to apartment did not exceed 528 feet); United States v. 

__________
brated measuring wheel" used to measure the 674-foot distance was 
"in working order."


Baylor, 97 F.3d 542, 546-47 (D.C. Cir. 1996) (where distance 
from school to building was 534 feet, jury could reasonably 
conclude additional distance to basement apartment did not 
exceed 466 feet). Indeed, common sense was not all the 
jurors had to rely on here. During the trial, the jury saw 
several videotapes showing both the inside and outside of 
Jones' store, and also had the benefit of a diagram of the 
neighborhood that could be used to roughly compare the size 
of the entire store to the distance between the store and the 
school. See Gov't Appendix (Vol.I) at 18.

 IV

 Glover next contends that he was the victim of "sentencing 
entrapment." He charges that his concurrent sentences un-
der the schoolyard statute should be vacated because the 
government "orchestrated" the crimes to occur within 1000 
feet of a school, by luring him to Jones' store to make the 
drug transactions. Because defendant did not raise this claim 
below, we review it solely for plain error. See Fed R. Crim. 
P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993).

 First, we see no evidence of "orchestration" here. As 
Glover himself testified, he "often went to Jones' store to play 
numbers [the lottery]," Glover Br. at 17, referring specifically 
to the period during which Jones asked him for drugs. That 
alone made the store a logical location for the drug deal. Nor 
does the government appear to have had much motive to lure 
Glover to the store to take advantage of enhanced sentences 
for distributing within 1000 feet of a school. Glover's recidi-
vist history generated substantially longer sentences than did 
the schoolyard provision. See Part V below.

 But even if the government had chosen Jones' store to 
increase Glover's sentencing exposure, that alone would not 
constitute sentencing entrapment. The usual elements of the 
entrapment defense--inducement and lack of predisposition--
would still have to be shown. As we have held before, even 
where government agents insist that cocaine be delivered in 
the form of crack rather than powder to ensure a stiffer 
penalty, that does not constitute sentencing entrapment 

where the defendants "showed no hesitation in committing 
the crimes for which they were convicted." See United States 
v. Shepherd, 102 F.3d 558, 566-67 (D.C. Cir. 1996) (quoting 
United States v. Walls, 70 F.3d 1323, 1328-30 (D.C. Cir. 
1995)). There is no reason for the rule to be any different 
where the issue is the location of the transaction rather than 
the kind of drug distributed. In this case, Glover readily 
agreed to the drug transaction, and showed no hesitation 
about conducting it in Jones' store. That, alone, is "enough 
to destroy [his] entrapment argument." Walls, 70 F.3d at 
1329.

 V

 Glover also argues that the enhancement of his sentences, 
based on prior convictions in Maryland and the District of 
Columbia for heroin possession, violated the Ex Post Facto 
Clause of the Constitution, art. I, s 9, cl. 3. Glover contends 
that a 1994 statute impermissibly and retroactively "reclassi-
fied" these prior misdemeanors as felonies. We review this 
legal claim de novo. See United States v. Williams-Davis, 90 
F.3d 490, 511 (D.C. Cir. 1996).

 At the time Glover committed the heroin offenses, Mary-
land and the District of Columbia considered them misde-
meanors, even though each carried with it the possibility of 
imprisonment for more than one year because of Glover's 
prior criminal history. Moreover, until 1994, they also would 
have been considered misdemeanors for the purpose of en-
hancing a federal sentence. See 21 U.S.C. s 841(b)(1)(A) 
(1988) (defining "felony drug offense" as an offense "that is a 
felony under any law of a State ... that prohibits or restricts 
conduct relating to narcotic drugs...."). But on September 
13, 1994, Congress changed the law to define the term "felony 
drug offense" as "an offense that is punishable by imprison-
ment for more than one year under any law of the United 
States or of a State ... that prohibits or restricts conduct 
relating to narcotic drugs...." Violent Crime Control and 
Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. IX, 
s 90105, 108 Stat. 1987-88, 2151 (codified at 21 U.S.C. 
s 802(44)).


 Title 21 of the U.S. Code establishes different sentences for 
distributing different amounts of crack cocaine, and provides 
for enhanced sentences if the distribution occurs "after prior 
conviction[s] for felony drug offense[s]." 21 U.S.C. 
s 841(b)(1)(A) & (B). If his prior heroin convictions had not 
been considered felony drug offenses, Glover would have 
faced statutory terms of five to forty years imprisonment for 
the August 23, 1995 sale of five grams or more of crack, and 
ten years to life for each of the subsequent sales of fifty 
grams or more. See 21 U.S.C. s 841(b)(1)(B)(iii) & (A)(iii); 
see also Gov't Br. at 32 n.32. Because the prior convictions 
were considered "felony drug offenses" under the statute, 
however, he faced terms of ten years to life for the five-gram 
charge and mandatory life imprisonment for distributing fifty 
grams or more. See 21 U.S.C. s 841(b)(1)(B)(iii) & (A)(iii).

 The aspect of the Ex Post Facto Clause with the most 
relevance to Glover's claim is that which bars the government 
from retroactively "increas[ing] the punishment for criminal 
acts." California Dep't of Corrections v. Morales, 514 U.S. 
499, 504 (1995) (internal quotations and citation omitted); 
Collins v. Youngblood, 497 U.S. 37, 42-43 (1990). It is well-
settled, however, that a sentencing enhancement based on 
past offenses is not an "additional penalty for the earlier 
crimes," but rather "a stiffened penalty for the latest crime, 
which is considered to be an aggravated offense because a 
repetitive one." Gryger v. Burke, 334 U.S. 728, 732 (1948); 
see also Nichols v. United States, 511 U.S. 738, 747 (1994) 
("Enhancement statutes, whether in the nature of criminal 
history provisions ... or recidivist statutes ... do not change 
the penalty imposed for the earlier conviction."). For this 
reason, the circuits uniformly have rejected similar Ex Post 
Facto attacks on other repeat offender statutes. See United 
States v. Cabrera-Sosa, 81 F.3d 998, 1001-02 (10th Cir. 1996); 
United States v. Farmer, 73 F.3d 836, 841 (8th Cir. 1996); 
United States v. Presley, 52 F.3d 64, 68 (4th Cir. 1995); 
United States v. McCalla, 38 F.3d 675, 680 (3d Cir. 1994); 
United States v. Saenz-Forero, 27 F.3d 1016, 1019-21 (5th 
Cir. 1994); United States v. Arzate-Nunez, 18 F.3d 730, 733-
35 (9th Cir. 1994); United States v. Forbes, 16 F.3d 1294, 


1301-02 (1st Cir. 1994); Covington v. Sullivan, 823 F.2d 37, 
39-40 (2d Cir. 1987).

 Despite Glover's characterization, the 1994 "reclassifica-
tion" of his prior crimes did not add a new penalty for those 
crimes themselves. Like other repeat offender statutes, it 
did nothing more than prospectively define new, more drastic 
consequences if Glover committed a further crime in violation 
of s 841(b). Because the provision expanding the category of 
prior offenses that would prospectively be considered "felony 
drug offenses" was passed in 1994, a year before the first 
drug transaction at issue here, Glover had "fair warning," see 
Miller v. Florida, 482 U.S. 423, 430 (1987), that he would face 
stiffer penalties as a repeat offender if he committed another 
drug-related offense. Those penalties were punishments for 
his 1995 crimes, not for his prior crimes, and therefore do not 
violate the Ex Post Facto Clause even though the federal 
statute labeled the prior convictions differently than did the 
states. See Arzate-Nunez, 18 F.3d at 733.6

 VI

 Finally, Glover argues that he was denied effective assis-
tance of counsel at trial. Where, as here, the defendant has 
not sought to develop a factual record of ineffectiveness in the 
district court, our normal practice is to remand for an eviden-
tiary hearing. See United States v. Toms, 136 F.3d 176, 181 
(D.C. Cir. 1998). However, we have recognized two excep-
tions to this general rule: "when the trial record alone 
conclusively shows that the defendant is entitled to no relief 
and when the record conclusively shows the contrary." Id. 
(quoting United States v. Gaviria, 116 F.3d 1498, 1512 (D.C. 
Cir. 1997)); see also United States v. Fennell, 53 F.3d 1296, 

__________
 6 We likewise reject Glover's one-sentence suggestion that by 
reclassifying his convictions as felonies, Congress "usurped the 
state's power to classify crimes committed within the state's juris-
diction" in violation of the Tenth Amendment. Congress did not 
seek to reclassify any offense for purposes of state law; the 1994 
statute merely defined how prior conduct by the defendant would 
be treated for purposes of federal law.

1303-04 (D.C. Cir. 1995); United States v. Poston, 902 F.2d 
90, 99 n.9 (D.C. Cir. 1990). Here the record conclusively 
shows that Glover is entitled to no relief.

 Under the familiar two-part test enunciated in Strickland 
v. Washington, a defendant seeking to establish ineffective 
representation must show both "that counsel's performance 
 was deficient," and that "the deficient performance prejudiced 
the defense." 466 U.S. 668, 687 (1984). This means a 
defendant must show that his counsel's performance fell 
below "an objective standard of reasonableness" under pre-
vailing professional norms, id. at 687-88, and that "there is a 
reasonable probability that, but for counsel's unprofessional 
errors, the result of the proceeding would have been differ-
ent," id. at 694. Glover fails to satisfy either part of the 
Strickland test.

 Glover's principal claim is that his trial counsel failed to 
cross-examine Jones, the government informant, regarding 
Jones' prior arrest for making a false statement while apply-
ing to purchase a firearm. But the record indicates that 
counsel instead elicited the same information through cross-
examination of a DEA agent. See Tr. 325-26. Arguably, this 
strategy was more effective because it prevented Jones from 
explaining away or minimizing the arrest. In any event, 
there was nothing ineffective about it and we decline to 
second-guess trial counsel's strategy.

 Glover also complains that his counsel failed to object to 
the admission of the diagram showing the location of Jones' 
store and Banneker High School, because there was no 
testimony that either had been in the same location at the 
time of the drug transactions. Such an objection would have 
been frivolous, because there is and was no dispute about the 
actual location of either building at the relevant time. Glo-
ver's other allegations about his trial counsel's asserted inef-
fectiveness, which we have carefully reviewed, are equally 
frivolous.

 VII

 One final detail remains. While Glover has not raised the 
issue, the government notes that the forfeiture order entered 

in this case was not pronounced in Glover's presence as 
required by Federal Rule of Criminal Procedure 43(a). See 
Gov't Br. at 37 n.36. Rather than remand to the district 
court for compliance with this requirement and re-sentencing, 
the government requests that we vacate the forfeiture count. 
If the case instead were remanded, the government advises, it 
would seek dismissal rather than bear the expense of bring-
ing Glover back to court for this purpose alone. As Glover 
has not objected to this disposition, the forfeiture count is 
hereby vacated. See Gaviria, 116 F.3d at 1530. In all other 
respects, the judgment of the district court is affirmed.